René P. Voss (CA Bar No. 255758)
Attorney at Law
15 Alderney Road
San Anselmo, CA  94960
Telephone:  415-446-9027
Facsimile:  267-316-3414
Email:  renepvoss@gmail.com

Sharon E. Duggan (CA Bar No. 105108)
Attorney at Law
370 Grand Avenue Suite 5
Oakland, CA 94610
Telephone:  510-271-0825
Facsimile:  510-271-0829
Email:  foxsduggan@aol.com

For Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CONSERVATION CONGRESS, a nonprofit corporation, ENVIRONMENTAL PROTECTION INFORMATION CENTER, a nonprofit corporation,<br><br>    Plaintiffs,<br><br>    v.<br><br>NANCY FINLEY, in her official capacity as Field Supervisor, Arcata Fish and Wildlife Office, UNITED STATES FISH AND WILDLIFE SERVICE, an administrative agency of the United States Department of Interior, TYRONE KELLEY, in his official capacity as Forest Supervisor, Six Rivers National Forest, and UNITED STATES FOREST SERVICE, an administrative agency of the United States Department of Agriculture,<br><br>    Defendants, and<br><br>TRINITY RIVER LUMBER COMPANY, a California Corporation,<br><br>    Defendant Intervenor. | Case No.: 3:11-cv-04752-SC (LB)<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION AND MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT**<br><br>Administrative Procedure Act Case and Endangered Species Act Case<br><br>Next Scheduled Hearing<br>Date: June 8, 2012<br>Time: 10:00 a.m.<br>Hon. Samuel Conti<br>Courtroom 1, 17th floor |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. ii

MOTION AND NOTICE OF MOTION ............................................................... 1

INTRODUCTION AND STATEMENT OF THE ISSUES TO BE DECIDED ........................ 1

STATEMENT OF FACTS .................................................................................. 2

LEGAL STANDARDS ..................................................................................... 5

ARGUMENT ................................................................................................. 7

I.     Plaintiffs Have Standing to Challenge the Beaverslide Project .................................... 7

II.    The USFS Has Violated the ESA ................................................................. 9

     A.     The USFS Failed to Reinitiate Consultation Based on New Information ........... 9

          1.     New Information in the 2011 Revised NSO Recovery Plan Explicitly Requires Evaluation of Short-Term Effects on NSOs and Their Prey .......... 10

          2.     New Information Requires the USFS to Provide Additional NSO Habitat Protections Not Previously Considered or Analyzed ................ 15

          3.     New Information About the Barred Owl and Effects From Management Activities that Increase Competition With the NSO ........ 18

     B.     The USFS Failed to Use the Best Available Scientific Data ........................ 21

III.   The FWS Violated the ESA by Failing to Use the Best Scientific Data to Critically Analyze Short-Term Adverse Effects from Management Activities and Long-Term Effects from Barred Owls on NSOs .................................... 22

     A.     The FWS Consultation Process Necessarily Includes Both the Letter of Concurrence and the Technical Assistance Letter ................................. 23

     B.     The FWS Failed to Provide Critical Analysis and Feedback to the USFS About the Short-Term Effects on NSOs and Their Prey ....................... 24

     C.     The FWS Failed to Provide Critical Analysis and Feedback to the USFS About the Effects from Barred Owls and Related Management Activities on NSOs ................................................................................. 26

IV.   The USFS Failed to Consider the Direct, Indirect, and Cumulative Effects of the Beaverslide Project, in Violation of NEPA ....................................... 28

     A.     The USFS Failed to take a Hard Look at the Short-Term Effects on NSOs and Their Prey ................................................................ 29

     B.     The USFS Failed to Consider Effects from Barred Owls and Management Activities that Could Increase Competition with the NSO ....................... 31

V.   The USFS Failed to Comply with the SRNF Plan and Failed to Ensure the
     Diversity of Species, in Violation of the NFMA ............................................................32

     A.    Species Diversity, MIS Monitoring, and the Six Rivers National Forest
           Plan ...............................................................................................................32

     B.    The USFS Has Failed to Provide Accurate and Reliable Data to Ensure it
           Meets its Monitoring, Viability, and Diversity Requirements...........................35

           1.    Western Screech Owls and the Snag Assemblage ..................................36

           2.    Pacific Fishers, American Martens, Pileated Woodpeckers, and
                 Old Growth and Mature Forest Habitats..................................................38

VI.  Plaintiffs' Are Entitled to Declaratory and Injunctive Relief .........................................41

CONCLUSION...............................................................................................................................45

**TABLE OF AUTHORITIES**

<u>CASES:</u>

*Alliance for the Wild Rockies v. Cottrell*, 613 F.3d 960 (9th Cir. July 28, 2010)......................43

*Alliance for the Wild Rockies v. Bradford*, CV-09-160-M-DWM, Order Denying Motion To Alter or Amend the Judgment (Dkt #51), Slip. Op. (D. Mont. Aug. 5, 2010) (Declaration of René Voss, Exhibit C) ......................................43

*Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531 (1987)......................................43

*Baykeeper v. U.S. Army Corps of Engineers*, 2006 WL 2711547 (E.D. Cal. Sept. 20, 2006)......................................................................................................45

*Bennett v. Spear*, 520 U.S. 154 (1997) .............................................................. 22, 23

*Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) ............................5

*Colorado Wild, Inc. v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213 (D. Colo. 2007)......................45

*Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988)......................................................22

*Conservation Cong. v. U.S. Forest Serv.*, 555 F. Supp. 2d 1093 (E.D. Cal. 2008) ........ 35, 36, 37

*Earth Island Institute v. U.S. Forest Service*, 442 F.3d 1147 (9th Cir. 2006) ..................... 29, 44

*Forest Guardians v. Johanns*, 450 F.3d 455 (9th Cir. 2006)......................................... 10, 42

*Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089 (9th Cir.2003)......................................33

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ..........................................................................................................7, 8

*Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378 F.3d 1059 (9th Cir. 2004) ............................................................................................................35

*Hells Canyon Alliance v. U. S. Forest Service*, 227 F.3d 1170 (9th Cir. 2000) ..........................6

*High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630 (9th Cir. 2004)......................................44

*High Sierra Hikers Ass'n v. Moore*, 561 F. Supp. 2d 1107 (N.D. Cal. 2008)..........................45

*Idaho Sporting Congress, Inc. v. Alexander*, 222 F.3d 562 (9th Cir. 2000)...................... 44, 45

*Idaho Sporting Congress. Inc. v. Rittenhouse*, 305 F.3d 957 (9th Cir. 2002) ..........................43

*Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754 (9th Cir.1996) ..........................................................................................................33, 34

*Klamath-Siskiyou Wildlands Center v. U.S. Forest Service*, 373 F. Supp. 2d 1069 (E.D. Cal. 2004) ......................................................................................5

*Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094 (9th Cir. 2002).......................................44

*Lands Council v. McNair*, 494 F.3d 771 (9th Cir. 2007)......................................................45

*Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) (en banc).............................. 34, 35, 45

*Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005) ......................................................43

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..................................... 8

*Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743 (2010) ................................. 42

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29 (1983) .......................................................... 6, 40

*Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441 (9th Cir. 1992) ...................... 9

*Nat. Audubon Soc'y v. U.S. Forest Serv.*, 46 F.3d 1437 (9th Cir. 1993) ..................... 7

*National Wildlife Federation v. Marsh*, 721 F.2d 767 (11th Cir. 1983) ..................... 45

*National Wildlife Fed'n v. National Marine Fisheries Serv.*, 235 F. Supp. 2d 1143 (W.D. Wash. 2002) .......................................................... 45

*Native Ecosystems Council v. Dombeck*, 428 F.3d 1233 (9th Cir.2005) ..................... 35

*Native Ecosystems Council v. Tidwell*, 599 F.3d 926 (9th Cir. Mont. 2010) ..................... passim

*Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722 (9th Cir. 2001) .............................. 45

*Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*, 23 F.3d 1508 (9th Cir. 1994) .................... 42, 44

*Nat'l Wildlife Fed'n v. Harvey*, 440 F. Supp. 2d 940 (E.D. Ark. 2006) ........................... 24

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917 (9th Cir. 2008) ................... 22

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782 (9th Cir. 2005) ............ 42, 44

*Neighbors of Cuddy Mt. v. U.S. Forest Serv.*, 137 F.3d 1372 (9th Cir. 1998).......... 29, 30, 43, 44

*Northern Alaska Environmental Center v. Hodel*, 803 F.2d 466 (9th Cir. 1986) ...................... 45

*Northwest Resource Info. Ctr. v. National Marine Fisheries Serv.*, 56 F.3d 1060 (9th Cir. 1995) .......................................................... 29

*Ohio Valley Environmental Coalition v. U.S. Army Corps of Engineers*, 528 F. Supp. 2d 625 (S.D.W.Va. 2007) ................................................. 45

*Or. Natural Res. Council Fund v. Goodman*, 505 F.3d 884 (9th Cir. 2007) .......................... 43

*Pacific Rivers Council v. Thomas*, 30 F.3d 1050 (9th Cir. 1994) ................................. 10

*Pacific Coast Fed. of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028 (9th Cir. 2001) .......................................................... 6, 10

*San Francisco Baykeeper v. U.S. Army Corps of Eng'rs*, 219 F. Supp. 2d 1001 (N.D. Cal. 2002) .......................................................... 23

*Seattle Audubon Soc. v. Evans*, 771 F. Supp. 1081 (W.D. Wash. 1991) ........................... 44, 45

*Sierra Club v. Bosworth*, 510 F.3d 1016 (9th Cir. 2007) ................................... 43, 45

*Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir. 1987) ...................................... 6, 10, 42

*Sierra Club v. Martin*, 71 F. Supp. 2d 1268 (N.D. Ga. 1996) ................................. 45

*Sierra Club v. U.S. Forest Service*, 843 F.2d 1190 (9th Cir. 1988) ............................. 45

*Sierra Nevada Forest Protection Campaign* ("*SNFPC*") *v. Tippin*, 2006 WL 2583036 (E.D. Cal. Sept. 6, 2006) ............................................. 45

*Southwest Center for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443 (9th Cir. 1993) ........................................................................................................ 6

*Summers v. Earth Island Institute*, 555 U.S. 488 (2009) ................................... 7, 8

*Thomas v. Peterson*, 753 F. 2d 754 (9th Cir. 1985) ............................................ 45

*TVA v. Hill*, 437 U.S. 153 (1978) ....................................................................... 42

*Washington Toxics Coalition v. EPA*, 413 F.3d 1024 (9th Cir. 2005) ............ 6, 7, 42

*Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011) ........... 6, 7

*Western Watersheds Project v. Matejko*, 468 F.3d 1099 (9th Cir. 2006) .................. 5

*Wild Fish Conservancy v. Salazar*, 628 F.3d 513 (9th Cir. 2010) ........................... 10

*Wild Fish Conservancy v. U.S. Environmental Protection Agency*, 2010 U.S. Dist. LEXIS 41838 (W.D. Wash. Apr. 28, 2010)

*Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365 (2008) ........................... 42

STATUTES:

Administrative Procedure Act

    5 U.S.C. § 706(2) ............................................................................................ 41

    5 U.S.C. § 706(2)(A) ........................................................................................ 6

Endangered Species Act

    16 U.S.C. §1531(c)(1) ...................................................................................... 9

    16 U.S.C. § 1536(a)(1) ..................................................................................... 9

    16 U.S.C. § 1536(a)(2) ........................................................................... 9, 21, 22

    16 U.S.C. § 1536(c)(1) ..................................................................................... 9

    16 U.S.C. § 1540(g) ......................................................................................... 6

    16 U.S.C. § 1540(g)(1)(A) ................................................................................ 6

National Environmental Policy Act

    42 U.S.C. 4332(2)(C) ...................................................................................... 28

National Forest Management Act

    16 U.S.C. § 1600 *et seq.* ................................................................................. 32

    16 U.S.C. § 1604(g)(3)(B) ........................................................................... 32, 41

    16 U.S.C. § 1604(i) ...................................................................................... 33, 41

CODE OF FEDERAL REGULATIONS:

40 C.F.R. § 1500.1(b) ................................................................................ 28

40 C.F.R. § 1502.1 ..................................................................................... 28

40 C.F.R. § 1508.7 ..................................................................................... 28

50 C.F.R. § 402.12(a) .................................................................................. 9

50 C.F.R. § 402.13(a) ................................................................ 23, 24, 25, 26

50 C.F.R. § 402.14(a) ............................................................................. 9, 14

50 C.F.R. § 402.16(b) ......................................................................... passim

50 C.F.R. § 402.12 ..................................................................................... 14

50 C.F.R. Part 402 ....................................................................................... 6

FEDERAL REGISTER NOTICES:

69 Fed. Reg. 18,770 (April 8, 2004) ............................................... 39, 40, 41

77 Fed. Reg. 14,062 (Mar. 8, 2012) ............................................................ 14

OTHER AUTHORITIES:

Fed. R. Civ. P. 56 ........................................................................................ 1

Fed. R. Civ. P. 56(a) ................................................................................... 5

Civil L.R. 5-5 ............................................................................................ 46

Civil L.R. 5-6 ............................................................................................ 46

Civil L.R. 56-1 ............................................................................................ 1

**MOTION AND NOTICE OF MOTION**

PLEASE TAKE NOTICE that at 10:00 a.m. on June 8, 2012, or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Samuel Conti, located at the Federal Courthouse, 450 Golden Gate Avenue San Francisco California, Plaintiffs will move for Summary Judgment in accordance with Fed. R. Civ. P. 56 and Civil L.R. 56-1. Plaintiffs seek declaratory and injunctive relief as set forth in their complaint. This motion is based on this notice of motion and motion, the accompanying memorandum of points and authorities, supporting Declarations, and the papers and pleadings on file in this action.

**INTRODUCTION AND STATEMENT OF THE ISSUES TO BE DECIDED**

Plaintiffs Conservation Congress' ("CC") and Environmental Protection Information Center's ("EPIC") challenge the Beaverslide Timber Sale and Fuel Reduction Project ("Beaverslide Project"), authorized by the U.S. Forest Service ("USFS") and the U.S. Fish and Wildlife Service ("FWS"). The claims in this case concern violations of Federal agency duties to protect wildlife habitat, including habitat for the protected northern spotted owl ("NSO"), listed as "threatened" with extinction under the Endangered Species Act ("ESA"), and habitat that must be protected to ensure wildlife diversity and viability of species that depend on mature and old growth forest with abundant snags in the Six Rivers National Forest ("SRNF").

The Beaverslide Project, which will remove and degrade NSO habitat, was approved only three months before the FWS issued its new 2011 Revised NSO Recovery Plan ("2011 RP"). The 2011 RP included a significant exploration of NSO science with a better understanding of management issues with NSOs than the previous 2008 NSO Recovery Plan, on which the Beaverslide Project has based its analysis. This new recovery plan and two new comprehensive scientific studies present at least three new realizations (information) not yet considered in the Beaverslide Project analysis, which require the agencies to reinitiate consultation because this new information reveals that the Beaverslide Project may affect the NSO in a manner, or to and extent, not previously considered.

**First**, the 2011 RP presents new scientific information about the short-term effects of thinning and burning on NSOs and their prey, which the 2011 RP states must be explicitly

analyzed if management activities are proposed, as here, in NSO core areas.  **Second**, the two

new comprehensive studies and the 2011 RP state that management agencies should use a more

inclusive definition of NSO habitat, which the agencies can establish with a new habitat model.

**Third**, the two studies and the 2011 RP discuss the increasing threat from the invasive and

highly competitive barred owl and suggest that agencies should avoid management activities that

increase competitive pressures on NSOs from barred owls, especially in NSO core areas.

The issues presented by this motion are:

(1) Whether the USFS violated the ESA by failing to consider and evaluate this new

information and must reinitiate consultation with the FWS over the likely adverse effects to the

NSO, its habitat, and its prey;

(2)  Whether the FWS violated the ESA by failing to use the best available scientific data

in evaluating the effects on the NSO from the short-term impacts of the Beaverslide Project and

from the barred owl's invasion into NSO habitat and how management activities may increase

competitive pressures from barred owls on resident NSOs;

(2) Whether the USFS violated the National Environmental Policy Act ("NEPA") by

failing to consider the direct, indirect, and cumulative effects from its action on the NSO, its

habitat, and its prey; and

(4) Whether the USFS violated the National Forest Management Act ("NFMA") by

failing to comply with the monitoring requirements of the SRNF Forest Plan and whether its

failure to reliably monitor management indicator species violates the Forest Plans' species

viability provisions and the species diversity provisions of the NFMA.

## STATEMENT OF FACTS

The northern spotted owl ("NSO") is listed as a species threatened with extinction under

the ESA due to widespread loss of habitat.  FWS201331.[1]  Its population continues to decline

range-wide at a rate of about 3% per year, including declines in northwest California.

BAR012476_39; BAR012476_38; *see also* Declaration of Dr. Dominick DellaSala ("DellaSala

---

[1] The prefix "FWS" refers to the Bates number pages in the U.S. Fish & Wildlife Service's
Record and "BAR" refers to the Bates number pages in the U.S. Forest Service Record.

1    Decl.") ¶ 4.  Thirteen NSO territories are within or adjacent to the Beaverslide Project area, and

2    past surveys have detected seven owl pairs and six territorial single owls in these territories.

3    BAR007879-80.  FWS has set habitat thresholds below which the owl's reproductive success

4    declines:  500 acres of nesting and roosting ("N/R") habitat in the 0.7 mile radius, and 1,340

5    acres of N/R habitat in the 1.3 mile radius from NSO activity centers.  BAR007880.  Twelve of

6    the thirteen NSO territories within the Beaverslide Project area are currently below the FWS

7    threshold within the 0.7 mile radius and all territories are below the FWS threshold within the 1.3

8    mile radius.  BAR007881.  In 2008, NSO territory No. 9 was occupied by a reproductive pair of

9    NSOs.  BAR007879.  The FWS noted that this NSO territory had the lowest amount of nesting

10   and roosting habitat of all the territories at 142 and 640 acres at the 0.7 and 1.3 mile scales,

11   respectively.  BAR008061.  The first four Beaverslide Project units that could be logged are

12   located in NSO territory No. 9.  Declaration of René Voss ("Voss Decl.") ¶ 4.  Defendant-

13   Intervenor holds a contract with the USFS to log these four units, and logging could begin in all

14   four units on July 9, 2012 if surveys confirm that NSOs are not nesting, otherwise logging in two

15   of the units closest to the nest area could not begin until September 15, 2012.  *Id.* ¶ 5.

16          The Beaverslide Project area is approximately 4,707 acres and is located in the Upper

17   Mad River Watershed about 1.3 miles south of Ruth, California on the Mad River Ranger

18   District of the SRNF.  BAR000700.  The purpose of the Beaverslide project is to provide timber

19   commodities and reduce fuels to improve fire protection.  BAR000701.  The USFS decision

20   authorizes 2,319 acres of thinning (removing 22.4 million board feet of timber), 1,118 acres of

21   fuel treatments, 1,172 acres of fuel treatment corridors, and construction of 5.1 miles of new

22   temporary roads.  BAR000712.  Thinning will remove trees up to 24 inches in diameter.

23   BAR000257.  The project will remove 0.7 acres of NSO low and moderate quality N/R habitat

24   and remove 4.6 acres of foraging habitat.  BAR007927; BAR008059.  The project will further

25   degrade 850 acres of NSO low and moderate quality N/R habitat and degrade 2,194 acres of

26   foraging habitat.  BAR008060.  No treatments are proposed in NSO high quality N/R habitat.  *Id.*

27          In 2009, USFS issued its Biological Assessment of the Potential Impacts to Threatened,

28   Endangered and Proposed Wildlife Species ("BA") for the Beaverslide Project.  BAR007917.  In

response, on October 11, 2009 FWS issued a written concurrence that the project may affect but is not likely to adversely affect the NSO.  BAR007918.  In May 2010, USFS published Amendment #1 to its BA based on changes made to the project.  BAR007923.  On April 8, 2011, USFS issued its Record of Decision ("ROD") for the Beaverslide Project Supplemental Final Environmental Impact Statement ("EIS").  BAR000698.  On May 4, 2011, USFS submitted a letter to FWS, providing information about changes that occurred in the Beaverslide Project design.  BAR008055.  On June 28, 2011, FWS issued its new 2011 RP.  FWS201326.  The 2011 RP states that it is based on and was developed using the best scientific information available. FWS201342; FWS201344.  On September 8, 2011, FWS issued a new written concurrence that the project may affect but is not likely to adversely affect the NSO, based on its review of the BA, Amendment #1 of the BA, changes to the project, and the 2011 RP, determining that no further action pursuant to the ESA was necessary.  BAR008058-63.

The SRNF Land and Resources Management Plan ("LRMP" or "Forest Plan") uses Management Indicator Species ("MIS") to monitor the effects of plan implementation and to maintain viable populations of all native and desirable non-native species in the SRNF. BAR012734; BAR012847.  Among others, viability is a concern for a number of species that depend on mature or old growth forest with abundant snags, including the NSO, Pacific fisher, American marten, and northern goshawk.  BAR000327; BAR000328; BAR000313; BAR012849.  MIS serve as the primary measure of the biological diversity trend on the Forest. BAR012847.  Among the six individual MIS species and seven multi-species assemblages are the NSO, Pacific fisher, American marten, pileated woodpecker, and the Snag Assemblage, represent by eight species, including the western screech owl.  BAR012734; BAR012848.  No Pacific fishers or American martens are known to occupy or occur in the Beaverslide Project area.  BAR000327; BAR000329.  There are no known pileated woodpecker nesting or roosting sites in the Beaverslide area.  BAR000326.  For the eight species in the snag assemblage, six show either local decreases in populations, no data at the local scale, or no data at any scale, such as the western screech owl.  BAR011413-14.

1    Plaintiffs CC and EPIC submitted numerous written comments in response to the USFS'

2    NEPA process for the Beaverslide Project, during scoping, the Draft EIS comment period, and

3    the Supplemental Draft EIS ("SEIS") comment period; on December 21, 2009 and May 27, 2011

4    Plaintiffs timely administratively appealed both the first and second Beaverslide RODs.

5    BAR000933; BAR000973; BAR001208; BAR001282; BAR001345; BAR001349; BAR001435;

6    BAR001515; BAR001648.[2]  All of Plaintiffs' comments and both appeals raised concerns over

7    the Beaverslide Project's management impacts on NSOs, other wildlife species, and their

8    habitats.  *Id.*  On May 27, 2011, Plaintiffs issued an initial sixty-day Notice of Intent to sue over

9    violations of the ESA ("NOI") to USFS and FWS for harm to the NSO from the Beaverslide

10   Project.  BAR001727.  On July 15, 2011, USFS denied Plaintiffs' appeal and affirmed the ROD.

11   BAR001767.  On September 23, 2011, Plaintiffs commenced this action by filing their

12   complaint.  Dkt. # 1.  On October 27, 2011, Plaintiffs issued their second sixty-day NOI to USFS

13   and FWS for the NSO for the Beaverslide Project.[3]  On January 4, 2012, Plaintiffs amended their

14   complaint to add a new ESA claim based on its second sixty-day NOI.  Dkt. #21.

15                                    **LEGAL STANDARDS**

16   Entry of summary judgment is appropriate where "there is no genuine issue as to any

17   material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P.

18   56(a).  Summary judgment is generally appropriate for claims involving judicial review of

19   administrative action where review is based upon an administrative record.  *Klamath-Siskiyou*

20   *Wildlands Center v. U.S. Forest Service,* 373 F. Supp. 2d 1069, 1078 (E.D. Cal. 2004).

21   Review of agency actions or decisions under NFMA, NEPA, and in some cases under the

22   ESA, are subject to judicial review under the Administrative Procedure Act ("APA").  *Blue Mts.*

23   *Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998); *Western Watersheds*

24   *Project v. Matejko*, 468 F.3d 1099, 1107 (9th Cir. 2006).  The court must set aside the USFS'

25   and FWS' actions if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in

26   _____

27   [2] Because Plaintiffs won their first administrative appeal on issues unrelated to this case, the
     USFS issued a SEIS, which only address those unrelated issues.  *See* BAR000606.

28   [3] This document is contained in the PDF folder of the USFS electronic record as "10.27.2011
     Beaverslide NOI.pdf," marked "For Reference Only Not Part of Beaverslide Adm. Record."

1   accordance with law." 5 U.S.C. § 706(2)(A).  In making this determination, the Court must

2   conduct a "searching and careful," review of the agency action, to ensure that the agency has

3   articulated a rational connection between the facts found and the decision made.  *Motor Vehicle*

4   *Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 43

5   (1983).  The reviewing court must determine whether the action failed to consider all relevant

6   factors and whether it failed to consider an important aspect of the issue or offered an

7   explanation in contradiction of the evidence before the agency.  *Hells Canyon Alliance v. U. S.*

8   *Forest Service,* 227 F.3d 1170, 1177 (9th Cir. 2000); *Pacific Coast Fed. of Fishermen's Ass'n,*

9   *Inc. v. Nat'l Marine Fisheries Serv.,* 265 F.3d 1028, 1034 (9th Cir. 2001).

10          The ESA violations alleged in this case are subject to judicial review under the citizen

11   suit provisions of the ESA.  16 U.S.C. § 1540(g).  *Western Watersheds Project v. Kraayenbrink*,

12   632 F.3d 472, 481 (9th Cir. 2011).  Challenges to Section 7(a)(2) of the ESA and its

13   implementing regulations, 50 C.F.R. Part 402, are properly brought under ESA citizen suit

14   provisions.  *Washington Toxics Coalition v. EPA*, 413 F.3d 1024, 1030 (9th Cir. 2005).  This

15   provision allows for a civil suit to "enjoin . . . any . . . agency, who is alleged to be in violation of

16   any provision of this chapter or *regulation* [of the ESA]."  16 U.S.C. § 1540(g)(1)(A) (emphasis

17   added).  The ESA regulations require reinitiation of consultation after the initial agency decision

18   "if new information reveals effects of the action that may affect listed species or critical habitat

19   in a manner or to an extent not previously considered."  50 C.F.R. § 402.16(b).  Reinitiation

20   claims are properly brought under the ESA citizen suit provision and not under the APA.  *See*

21   *Kraayenbrink*, 632 F.3d at 481.  And because the ESA citizen suit provision does not supply an

22   independent standard of review, courts borrow the standard from the APA.  *See Sierra Club v.*

23   *Marsh*, 816 F.2d 1376, 1386-87 (9th Cir. 1987) (applying the APA's "not in accordance with

24   law" provision to a reinitiation claim).

25          In reviewing an agency's decision under the APA, the court's *scope of review* is

26   generally restricted to the record as it existed at the time of the decision.  *Southwest Center for*

27   *Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1449 (9th Cir. 1993).  However, the

28   following well established exceptions provide for consideration of extra-record evidence:

(1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) when the agency has relied on documents not in the record, . . .  (3) when supplementing the record is necessary to explain technical terms or complex subject matter[, or (4)] when plaintiffs make a showing of agency bad faith.

*Id.* at 1450.  Accordingly, courts have consistently allowed plaintiffs to introduce extra-record evidence under the first exception to show that the agency made factual errors or omissions.  *See, e.g., Nat. Audubon Soc'y v. U.S. Forest Serv.*, 46 F.3d 1437, 1448 (9th Cir. 1993) (district court properly allowed plaintiff's expert declaration to support allegation that the USFS had neglected to mention a serious environmental consequence on which the expert declaration shed light).

The *scope of review* for an ESA claim is not limited by the APA.  *Washington Toxics*, 413 F.3d at 1034 (because the ESA "independently authorized a right of action, the APA does not govern the plaintiffs' claims.").  The *scope of review* in ESA citizen suit claims allows the parties to proffer and the court to consider evidence from outside an administrative record.[4] *Kraayenbrink*, 632 F.3d at 497.

## ARGUMENT

### I.    Plaintiffs Have Standing to Challenge the Beaverslide Project

Plaintiffs CC and EPIC have standing because their members' interests would be injured by the Beaverslide Project.  "While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice."  *Summers v. Earth Island Institute*, 555 U.S. 488, 494 (2009) (citing *Sierra Club v. Morton,* 405 U.S. 727, 734-736 (1972)).  "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-181 (2000).

Plaintiffs' declarants demonstrate injury to their interests by establishing their use of the

---

[4] Plaintiffs reserve the right to submit supplemental briefing if Plaintiffs uncover additional evidence during discovery relevant to Plaintiffs' claims.

1    Beaverslide area and their harm to respective recreational and aesthetic interests, which includes

2    a desire to observe wildlife, including the NSO.  *See* Declaration of Kimberly Baker ("Baker

3    Decl.") ¶¶ 3-4; Decl. of Denise Boggs ("Boggs Decl.") ¶¶ 4-8; *see Friends of the Earth*, 528 U.S.

4    at 181 ("environmental plaintiffs adequately allege injury in fact when they aver that they use the

5    affected area and are persons 'for whom the aesthetic and recreational values of the area will be

6    lessened' by the challenged activity"); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 562-563

7    (1992) ("the desire to use or observe an animal species, even for purely esthetic purposes, is

8    undeniably a cognizable interest for purpose of standing.").  Plaintiffs' injuries are imminent

9    because logging in the Beaverslide area could start as soon as July 9, 2012.  *See* Voss Decl. ¶ 5

10   & Exhibit A, Page 74 of 95 (logging schedule).

11        Plaintiffs' injuries are caused by the USFS's proposed logging and fuel reduction

12   activities, by its failure to reinitiate consultation to protect the NSO, and by the FWS' failure to

13   provide the critical and necessary analysis about the adverse effects from the project and barred

14   owls.  *See* Baker Decl. ¶ 4; Boggs Decl. ¶¶ 8.  Plaintiffs' injuries are also caused by the USFS's

15   NFMA and NEPA procedural violations.[5]  Granting the relief requested herein will redress

16   Plaintiffs' injuries by compelling the agencies to follow laws to conserve threatened species,

17   such as the NSO under the ESA, disclosing the environmental effects as required by NEPA, and

18   protecting the diversity and viability of all species in the SRNF under the NFMA.  *See* Baker

19   Decl. ¶ 5-6 (Ex. A); Boggs Decl. ¶¶ 9-10 (Ex. B).  Because its members have standing, Plaintiffs

20   CC and EPIC have associational standing in this case.  *See Friends of the Earth*, 528 U.S. at 181

21   (an "association has standing to bring suit on behalf of its members when its members would

22   otherwise have standing to sue in their own right, the interests at stake are germane to the

23   organization's purpose, and neither the claim asserted nor the relief requested requires the

24   participation of individual members in the lawsuit"); *see* Baker Decl. ¶ 2 (Ex. A) (explaining

25   _____

26        [5] The Supreme Court uses a "relaxed" standard for causation and redressability where
     plaintiffs seek to enforce a procedural right the deprivation of which causes them to suffer
     concrete injuries in fact.  *Summers v. Earth Island Institute*, 555 U.S. at 496.  Only a 'person who
27   has been accorded a procedural right to protect *his concrete interests* can assert that right without
     meeting all the normal standards for redressability and immediacy.' ") (quoting *Lujan v.
28   Defenders of Wildlife*, 504 U.S. 555, 573 n.7 (1992), emphasis added by *Summers*).

Plaintiff EPIC's organizational purpose); Boggs Decl. ¶¶ 2, 5 (Ex. B) (same for Plaintiff CC).

For these reasons, Plaintiffs have standing.

**II.    The USFS Has Violated the ESA**

**A.    The USFS Failed to Reinitiate Consultation Based on New Information**

The USFS has an affirmative duty "to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act." 16 U.S.C. §1531(c)(1); *see also* 16 U.S.C. § 1536(a)(1) (placing an affirmative duty to "conserve" listed species upon federal agencies). Pursuant the ESA, the USFS must "insure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species . . . ." 16 U.S.C. § 1536(a)(2). To fulfill this mandate, the USFS must prepare a Biological Assessment ("BA") to identify all endangered or threatened species that are likely affected by the action. 16 U.S.C. § 1536(c)(1).

Through its BA, the USFS evaluates potential effects and must determine whether a species is "likely to be adversely affected" ("LAA") or not likely to be adversely affected ("NLAA") by the action. 50 C.F.R. § 402.12(a). If the proposed agency action "may affect" a listed species, the agency must consult with the appropriate wildlife expert agency, here FWS. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). For LAA actions the USFS must seek "formal" consultation, while for NLAA actions the agency may seek "informal" consultation. *See* 50 C.F.R. § 402.14(a), (b). Formal consultation culminates a FWS biological opinion, which analyzes whether the action "is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id*. § 402.14(g)(4). Informal consultation terminates when the FWS provides a written concurrence that the proposed action "is not likely to adversely affect listed species or critical habitat." *Id*. § 402.13(a).

The duty to consult is ongoing, and consultation must be reinitiated, even after project approval, in specified circumstances, "including the discovery of 'new information revealing effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered.' " *Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1445 n. 6 (9th Cir. 1992) (quoting 50 C.F.R. § 402.16(b)); *see Pacific Rivers Council v. Thomas*, 30 F.3d

1050, 1054-55 (9th Cir. 1994) (§ 7 creates ongoing responsibility to consult on agency actions); *Marsh*, 816 F.2d at 1387-88 (discussing circumstances under which re-initiation of consultation is required). The duty to reinitiate consultation in the face of new information applies to informal as well as formal consultation. *Forest Guardians v. Johanns*, 450 F.3d 455, 458 (9th Cir. 2006).

Here, the USFS failed to reinitiate consultation to consider new information of project effects on the NSO, including (1) the short-term effects on the NSOs and their prey, (2) the need for additional NSO habitat protections, and (3) the barred owl and adverse effects from management activities that adversely increase competition between the NSO and the barred owl.

      **1.**      **New Information in the 2011 Revised NSO Recovery Plan Explicitly Requires Evaluation of Short-Term Effects on NSOs and Their Prey**

ESA "regulations define 'effects of the action' as the project's immediate impacts on the species ("direct effects") and those impacts that are reasonably certain to occur in the future ("indirect effects")." *Marsh*, 816 F.2d at 1387 (quoting 50 C.F.R. § 402.02). Moreover, the USFS must "consider the *immediate* and long-term effects of the action and 'articulate[ ] a rational connection between the facts found and the conclusions made.' " *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 525 (9th Cir. 2010) (emphasis added, quoting *Pacific Coast Fed'n of Fishermen's Ass'ns*, 426 F.3d at 1090).

New information in the 2011 Revised NSO Recovery Plan ("2011 RP"), released on June 28, 2011 obligates the USFS to explicitly evaluate the short-term impacts from its thinning, fuel reduction, and burning activities on NSOs and their prey. The new 2011 RP states that

> active management projects should *explicitly* evaluate the short-term impacts to spotted owls *and their prey* while considering the long-term ecological benefits of such projects, *especially in spotted owl core-use areas*.

FWS201379 (emphases added). This directive relies on a new summary of the science about the adverse "short-term" direct impacts to owls and the owl's prey from thinning and other activities, and recognizes that these "short-term" impacts to the owl's prey can last for decades. FWS201377-78. Information about these short-term effects from thinning and other activities was not previously presented in either the 2008 NSO Recovery Plan (BAR012294-452) or the

2010 Draft Revised NSO Recovery Plan (FWS201143-323), and the USFS has not considered these short-term effects in its BA or Amendment #1 to its BA.  BAR007863; BAR007923.

The impact from commercial thinning, fuel reduction, and burning on the owl's prey base can immediately result in indirect impacts to NSOs, such as starvation, a further reduction in reproductive success, or abandonment of the owl's territory, especially in the owl's core use areas.  *See* DellaSala Decl. ¶ 11-18.  As the USFS acknowledges in its BA, the FWS has set habitat thresholds for nesting and roosting ("N/R") below which the owl's reproductive success declines.  BAR007880.

> The [FWS] set a threshold level of 500 acres of suitable N/R habitat within a 0.7 mile radius and 1,340 acres of suitable N/R habitat within a 1.3 mile radius of NSO activity centers to assess potential impacts to NSO territories from habitat loss.  *Twelve of the thirteen NSO territories within the planning area are currently below threshold within the 0.7 mile radius and all territories are below threshold within the 1.3 mile radius.*

BAR007881 (emphasis added).  NSO expert, Dr. Dominick A. DellaSala, explains:

> The fact that all of these owl territories are below the FWS' thresholds is a significant factor in analyzing potential harm to the resident owls in this area because any further degradation of the owl's structural habitat *or* the owl's prey habitat is likely to cause significant short-term adverse effects on the owls, which may disrupt essential behavioral patterns, including breeding, feeding, or sheltering, even though the long-term effects may be beneficial.  Even the short-term potential loss of reproductive success due to an insufficient prey base could be devastating to one or more owl pairs in the area, especially if they are near the end of their natural life spans.

Dellasala Decl. ¶ 13.

The 2011 RP states that studies have shown that NSOs decrease their use of harvested areas and owls may not again forage in stands that have been thinned or selectively logged for one to five decades.  DellaSala Decl. ¶ 14; *see* FWS201377.[6]  Moreover,

> We already know from the scientific research that northern spotted owls respond negatively to commercial thinning treatments similar to the management activities proposed for the Beaverslide Project, especially when the affected owl sites have low amounts of alternative habitat available (Forsman et al. 1984).  The Beaverslide Project appears to have very low amounts of nesting and roosting habitat available for owl survival and reproduction.

---

[6] As Dr. DellaSala notes in his declaration "This acknowledgment counsels for a precautionary approach to management (Hansen et al. 2009), which the Forest Service and U.S. Fish and Wildlife Service (FWS) do not appear to have taken in the Beaverslide Project."  *Id.*

DellaSala Decl. ¶ 11.  "But the primary concern and most important consideration in the Beaverslide area is the effect of the vegetation management activities and thinning on the spotted owl's prey species."  DellaSala Decl. ¶ 14.  The 2011 RP is clear about the effects of commercial thinning and burning on the NSO's prey species and explains that NSOs generally prey on northern flying squirrels, dusky-footed woodrats, bushy-tailed woodrats, and other small mammals.  FWS201378.  Studies on the effects of thinning on northern flying squirrels have generally found negative responses because thinning reduces the availability of truffles for up to 20 years.  *Id.* Truffles are the primary food resource for northern flying squirrels and other small mammals on which NSOs depend.  *Id.*  While the long-term benefits of thinning and burning may be beneficial for these prey species, thinning is likely to suppress flying squirrel populations for 20 years, thinning and burning detrimentally affects dusky-footed woodrats, and thinning has a negative effect on bushy-tailed woodrat populations that can last for decades.  *Id.*

Commercial thinning in the Beaverslide Project would degrade an additional 850 acres of low and moderate quality N/R habitat and degrade 2,162 acres of foraging habitat.  BAR008060. Although the USFS BA and amendment discuss the **long-term** benefits to the NSOs from management actions, they do not consider the **short-term** adverse effects on the NSO's use of thinned areas or the short-term effects from thinning and burning within the NSO's prey base.

As Dr. DellaSala observes:

In the Biological Assessment for the Beaverslide Project, the analyses of the short-term consequences of the proposed thinning activities are incomplete and do not take these considerations [on the owls' prey species] into account.  The BA admits that there will be short-term impacts to the owl's prey habitat from management activities:

"Most of the commercial thinning units would also be jackpot burned. Jackpot burning would also be used within fuel treatment units and corridor."  BA at p. 31.

"Burning could reduce prey species habitat temporarily in the immediate area, but is expected to be a short-term effect."  BA at p. 31.

"Foraging habitat will be affected in the short term as understory vegetation and some midstory vegetation up to 12 inches in diameter would be removed from the landscape and some downed logs would be consumed from the jackpot burning."  BA at p. 31.

"A maximum of 66 % of foraging habitat will be treated within the 0.7 mi

radius of an AC and up to 47 % within 1.3 miles." BA at p. 31; *see* BA Table 6, p. 23.

But the BA stops short and provides no numerical analysis of the loss of the owl's prey base, the length this loss will persist, or whether some of the owls may be adversely affected.

Even though the short-term effects from habitat degradation on the owl's prey are acknowledged and known in the scientific literature, which states that thinning and burning will adversely affect the owl's prey base for 20 years or more, there is no analysis in the BA that describes the short-term effects on the spotted owls that reside in the remaining territories.

DellaSala Decl. ¶ 17-18 (citing p. 31, which is BAR007893).

The FWS' written concurrences, issued in response to the USFS' BA and amended BA, provide even less analysis on the short-term impacts from commercial thinning on the owl's use of thinned areas and the effects on the owl's prey from commercial thinning and burning.[7] BAR007918 (Oct. 11, 2009 Letter of Concurrence or "LOC"); BAR008058 (Sept. 8, 2011 Technical Assistance Letter or "TAL").  The LOC and TAL are nearly identical in their analyses and discussions, although the later TAL also responds to minor changes made to the Beaverslide project discussed in the amended BA (BAR007923) and the letter from the USFS discussing changes to the project resulting from the final Beaverslide Project decision (BAR008055). BAR008059.  *See* Section III.B. for a full discussion of the shortcomings of the LOC and TAL.[8]

On its face, without an explicit evaluation of the short-term impacts to NSOs and their prey "especially in spotted owl core-use areas" (FWS201379), it is likely that implementation of the Beaverslide Project would have devastating effects on the owls:

Based on what the BA presents about the northern spotted owl's diminished habitat in the Beaverslide project area, it is my opinion that implementing this project could cause enough short-term harm of the owl's prey habitat and prey base that some of the owls run the risk of starving to death, they may not be able to successfully reproduce or rear their young, or they may abandon their habitat and thus the project could result in the disruption of essential behavioral patterns, including breeding, feeding, or sheltering.

---

[7] "A review of the FWS' Concurrence Letter and the FWS' Technical Assistance Letter also reveals similar shortcomings, and the FWS only presents it conclusions about the long-term habitat needs of the owl."  DellaSala Decl. ¶ 18.

[8] The FWS' reference to the 2011 RP and the sweeping conclusions in its TAL does not diminish the USFS' duty to address this new information through reinitiation of consultation. BAR008062.

DellaSala Decl. ¶ 20.[9]

The USFS has not adequately analyzed or considered the 2011 RP, which provides evidence of how the project may affect the threatened NSO "in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(b). The USFS must re-initiate consultation with the FWS to consider and analyze these short-term adverse impacts from proposed Beaverslide thinning and burning activities.

The recently proposed NSO critical habitat rule ("CH Rule") makes the same point about short-term effects in areas with limited habitat capability, such as the core NSO areas that are already below the FWS' thresholds. The rule states that

> variable thinning in single-story, uniform forest stands to promote the development of multistory structure and nest trees may result in short-term adverse impacts to the habitat's current capability to support owl dispersal and some foraging, but have long-term benefits by creating higher quality habitat that will better support territorial pairs of northern spotted owls. Such activities would have less impact in areas where foraging and dispersal habitat is not limiting. *Even though they may have long term beneficial effects, if they have short-term adverse effects, such actions may adversely affect critical habitat and would require formal consultation under section 7 of the Act.*

*Id.* at 14,126 (emphasis added). The entire Beaverslide Project area is proposed as critical habitat for the NSO. *See* 77 Fed. Reg. 14,062, 14,071 (Mar. 8, 2012) (Figure 3. map of proposed critical habitat in northern California showing all national forest in southern Trinity County proposed as critical habitat). Even if it is not so designated in the final CH Rule, the short-term harmful effects on the owls, as discussed by Dr. DellaSala, necessitate formal consultation and a biological opinion because those effects are "likely to adversely affect" a listed species. 50 C.F.R. §§ 402.12; 402.14(a).[10] Regardless, if there are any effects based on new information,

---

[9] NSO expert DellaSala bases his conclusion on his "analysis of the U.S. Forest Service's Biological Assessment and its Amendment, the FWS' Concurrence Letter, and the FWS' Technical Assistance Letter, as well as [his] knowledge of the scientific literature about the habitat needs of the northern spotted owl and its prey and [his] expertise as a former member of the FWS recovery team for the northern spotted owl." *Id.* ¶ 20.

[10] The USFS & FWS Level 1 Team provides advice about consultation matters. In their notes about the Beaverslide Project, they recognize that thinning in N/R low quality nesting and roosting habitat in core areas that are already below threshold could result in a "may affect, likely to adversely affect" ("MALAA") determination for which formal consultation is necessary: "thinning in N/R low quality in deficit home range depends on 1) the magnitude of the treatment [percent canopy closure, size of polygons to be treated and total treatment in AC]; 2) proximity to the AC; 3) whether the Rx is beneficial or not. *This action could be a MANLAA*

1   whether adverse or not, that "may affect listed species or critical habitat in a manner or to an

2   extent not previously considered" the USFS must reinitiate consultation.  50 C.F.R. § 402.16(b).

3   The USFS has therefore violated § 7 of the ESA and its regulations by failing to re-initiate

4   consultation over the new short-term effects information in the 2011 RP and CH Rule. [11]

### 2.   New Information Requires the USFS to Provide Additional NSO Habitat Protections Not Previously Considered or Analyzed

The USFS also has failed to critically analyze new information about the additional NSO

habitat protections for nesting and roosting, as provided in a new comprehensive report on the

owl's status, the 2011 RP, and the USFS  own internal analysis.

In 2011, a team of leading NSO biologists issued a comprehensive analysis of the owl's

status, titled "Population Demography *of* Northern Spotted Owls," (Forsman et al. (2011).

BAR012476_01-59.  The 2011 RP relies heavily on the Forsman 2011 data and analysis to

conclude that NSOs need sufficient and additional habitat protections, "to address the threats the

spotted owl faces from a loss of habitat due to harvest, loss or alteration of habitat from stand

replacing fire, loss of genetic diversity, and barred owls."  FWS201332; FWS201361

(recommending increased conservation and restoration of NSO sites and high-value NSO habitat

to help meliorate this impact); *see also* DellaSala Decl. ¶ 22.

> The fact that Barred Owls are increasing and becoming an escalating threat to the persistence of Spotted Owls does not diminish the importance of habitat conservation for Spotted Owls and their prey.  In fact, the existence of a new and potential competitor like the Barred Owl makes the protection of habitat even more important, since any loss of habitat will likely increase competitive pressure and result in further reductions in Spotted Owl populations.

BAR012476_44 (Forsman et al. 2011 "Summary, Conclusions, and Recommendations").

> Forsman et al. (2011) believe that a more inclusive definition of high quality habitat is needed than the rather vague definition provided in the 2008 recovery plan.  Much of the habitat occupied by northern spotted owls and their prey in the southern range does not fit the classical definition of "old-growth" as defined by Franklin and Spies (1991), and a narrow definition of habitat based on this criteria would exclude many areas currently occupied by northern spotted owls, particularly in northwest California where owls rely on structurally complex early seral vegetation for foraging interspersed with high quality old growth for nesting (Franklin et al. 2000).

27   *or a MALAA depending on site specific conditions*."  BAR008045 (emphasis added).

28   [11]  The proposed CH Rule that designates the Beaverslide Project area as critical habitat for the NSO likely constitutes additional new information that requires reinitiation of consultation.

DellaSala Dec. ¶¶ 23, 24; *see* BAR012476_44.

> Although low and moderate quality habitat is not defined by the agencies in the Beaverslide documents, the recommendations in Forsman et al. (2011) and Franklin et al. (2000) counsel that the Forest Service should re-evaluate what it considers high quality habitat to be more inclusive, meaning the agency should use its new habitat modeling techniques as described in Appendix C of the 2011 recovery plan to determine whether some of the low and moderate quality nesting and roosting habitat for spotted owls should instead be treated like high quality habitat in this part of the owls' range. Moreover, if this more inclusive definition includes some of the moderate and some low quality nesting and roosting habitat, then this additional habitat should not be degraded in the short-term and instead be treated like high quality, until the agency refines its habitat modeling and finalizes its critical habitat determination. Finally, the protection of this more inclusive definition of high quality habitat should also result in reducing competitive pressure from barred owls to assist in the conservation and recovery of spotted owls as implied in Dugger et al. (2011). *In other words, until the Forest Service has refined its habitat modeling, it should not degrade any nesting or roosting habitat, regardless of the level of quality previously categorized as this could result in irreparable harm to owl's prey and or nesting habitat.*

DellaSala Decl. ¶ 25 (emphasis added).

This new approach and information is also discussed in the 2011 RP under Recovery Action #10. FWS201404-201406.

> Recovery Action #10 is intended to use habitat modeling to better identify those areas where land manager should better protect, enhance and develop habitat in the quantity and distribution necessary to provide for the long-term recovery of spotted owls. Where modeling outputs and on the ground examinations indicate that vegetation management activities can improve long-term habitat conditions, they will be encouraged even if it may result in short-term impacts, but only if a determination is made that these longer term goals outweigh short-term impacts.

DellaSala Decl. ¶ 26 (citing 2011 RP, p. III-44 or FWS201406).

The USFS does not consider this new approach, nor does it provide any explanation for why the USFS (or FWS) has not applied the new modeling to determine whether some of the N/R habitat will eventually be considered part of the more inclusive definition of high quality owl habitat for the Beaverslide Project. Based on the TAL concurrence, the Level 1 team appears to be well on their way to applying this more inclusive habitat model on other projects on the Six Rivers National Forest:

> [O]ur spotted owl biologists on the Level I team are currently reevaluating applicable information regarding appropriate analysis scales, amounts, and definitions of northern spotted owl habitat to be used during analyses of future projects on the Six Rivers National Forest. This evaluation must be completed before the Level I team can move forward with many aspects of planning and

analysis of future potential projects on the Six Rivers National Forest.

BAR008063.  As Dr. DellaSala observes:

> Given my earlier conclusion that short-term irreparable harm to spotted owls is likely to occur because the proposed management activities will likely excessively degrade an area with already-diminished habitat capability, the agencies' position to forgo the habitat modeling for the Beaverslide area that would potentially provide a better description of high value habitat is arbitrary, and such a capricious decision cannot be supported by the scientific literature and the 2011 Revised Recovery Plan.  Given these new tools, it is unclear why the agencies would persist in moving forward with such a risky approach.

DellaSala Decl. ¶ 27.

In its haste to proceed, the USFS has also failed to consider or analyze another new requirement from Recovery Action #10 in the 2011 RP.  It states that, in the interim, while modeling is conducted, "Land managers should generally avoid activities that would reduce nesting, roosting and foraging habitat within provincial home ranges (*e.g.*, 1.3 mile radius) of reproductive pairs."  FWS201407.  "Reduce" presumably includes both removal and degradation, to the extent that the owls will avoid commercially thinned or burned areas, either because they lack the short-term structural needs of the owls or because the activities have diminished the owl's prey base.  *See* Section II.A., *supra*, about short-term effects.

Five of thirteen provincial home ranges were occupied by reproductive pairs of NSOs.  *See* BAR007879-80 (Table. 3, showing a "pair" for Territories No. 2, 3, 4, 9, and 49 in 2008); BAR008063_15 (showing territory 2 still occupied by a "pair" in 2011; all but one other territory was not surveyed in 2010-2011).  In these five territories, the USFS plans to both remove and degrade N/R and foraging habitat.  *See* BAR007884-85 (BA, Tables 5 & 6); BAR007927 (Amend #1 BA, Tables 3 & 4).  While the vast majority of the reduction of owl habitat within these 1.3 mile cores with a reproductive pair of owls is considered degradation, the USFS plans to remove about 0.7 acres of N/R and about 4.6 acres of foraging habitat.  *Id.*; BAR008059.  As discussed in the previous section, all of these territories are below the FWS thresholds for reproductive success within the 1.3 mile core area (BAR007881), and the proposed reduction of habitat from the proposed management activities will likely have adverse effects on the owls and their prey.  *See* DellaSala Decl. ¶¶ 19, 27.

Territory No. 9 (or Activity Center 9) is an example. In 2008, this unit was occupied by a reproductive pair of NSOs and is presumably still occupied. The FWS noted that Territory No. 9 "had the lowest amount of nesting and roosting habitat" of all the territories at 142 and 640 acres at the 0.7 and 1.3 mile scales, respectively (BAR008061), when threshold values for reproductive success are 500 and 1,340 acres, respectively. BAR007880. The first four logging units are located in Activity Center 9. *See* Voss Decl. ¶ 4. Under Defendant-Intervenor's contract with the USFS, Trinity River Lumber Co. could start logging in these units as early as July 9, 2012 or Sept. 15, 2012 if NSOs are found not to be nesting. *See* Voss Decl. ¶ 5.

The USFS failed to reinitiate consultation with the FWS by not considering new information identifying the need to protect a more inclusive definition of high quality N/R habitat and has failed to avoid reducing habitat quality in those core areas with reproductive NSO pairs in violation of § 7 of the ESA and its regulations.

### 3.   New Information About the Barred Owl and Effects From Management Activities that Increase Competition With the NSO

The USFS has failed to analyze new information about barred owls and adverse effects from management activities that increase competition between the NSOs and barred owls to the detriment of NSOs. This new information may affect the NSO "in a manner or to an extent not previously considered," and the USFS must reinitiate consultation. 50 C.F.R. § 402.16(b).

The 2011 RP has identified the barred owl as a much greater threat to the NSO than previously recognized, and one of the most pressing threats, similar to the threats from past and future habitat loss. FWS201332; FWS201347.

> [T]his threat is increasing throughout the [NSO's] range (Anthony et al. 2006). The barred owl is a habitat generalist, but it also favors the same habitat the spotted owl requires. Barred owls are more aggressive, can out-compete spotted owls throughout their range, and have even been known to attack spotted owls. Barred owls are now found in all areas where surveys have been conducted for spotted owls (Anthony et al. 2006), including forest areas that do not support spotted owl habitat (2011 Revised Recovery Plan for the northern spotted owl).

DellaSala Decl. ¶ 5. Moreover, barred owls have been found in all areas where surveys have been conducted for NSOs, and the FWS "assumes barred owls now occur at some level in all areas used now or in the past by spotted owls." FWS201348. Further, "the number of spotted

owl territories where barred owls are detected each year continues to increase . . . ."
BAR012476_68.  In fact, "[a] barred owl pair was detected once during the 2008 NSO surveys in
AC #3 which is deficient in both N/R and foraging (F) habitat."  BAR007879.[12]

Recent scientific literature provides an improved understanding about the interaction of
the two owl species and the effects from management.  The 2011 RP relies on a recent "seminal
study" that describes these interactions and management implications, titled "Transient dynamics
of invasive competition: Barred Owls, Spotted Owls, habitat, and the demons of competition
present" (or "Dugger et al. (2011)").  FWS201361 (referred to in the 2011 RP as "Dugger *et al.*,
in press"); FWS201405; DellaSala Decl. ¶ 28.

Dugger et al. (2011) recognize that the barred owl is currently displacing NSOs from its
historical breeding territories and that the extinction probability of pairs of NSOs triples when
compared to areas where barred owls were not present.  BAR012476_65.  Even when habitat for
NSOs is available, the probability that NSOs will colonize this habitat is greatly diminished
when barred owls are present.  BAR012476_65-66.  Moreover, as Dr. DellaSala explains,

> The study also found that occupancy rates for spotted owls were related to the
> amount and degree of fragmentation from logging of older forest; that is,
> occupancy of spotted owls increased when the proportion of old forest increased
> and/or the degree of fragmentation decreased.  Extinction of spotted owl
> territories was lowest in areas where old forests were most abundant, and
> colonization was highest in forests with less fragmentation.
> * * *
> Based on my review of Google Earth images of the Beaverslide Project area, it
> appears that the landscape has been substantially altered by past management
> activities, which has resulted in significant fragmentation.  Thus, any additional
> fragmentation from road building (even temporary roads) or logging is likely to
> adversely impact owl site occupancy.
>
> Given this fragmentation, it is no surprise that a pair of barred owls was detected
> in one of the spotted owl surveys in the Beaverslide Project area in 2008.

DellaSala Decl. ¶ 29, 31-32.  In other words, the fragmentation from past logging of older forests

---

[12] "Just because the Forest Service has failed to detect barred owls in later surveys in 2008
and 2009 is not conclusive that barred owls do not now reside in the Beaverslide area as barred
owls are increasing throughout the range of the northern spotted owl, including in northwest
California (Anthony et al. 2006).  Given the FWS' assessment, it is more likely than not that
barred owls have established territories in and around the Beaverslide area and additional
fragmentation is likely to maintain conditions suitable for further barred owl dispersal into
spotted owl habitat."  DellaSala Decl. ¶ 33.

1    the NSO prefers has likely had the indirect effect of allowing the barred owl, which can live in

2    younger and more fragmented forests, to move into the NSO's range.  And since the Beaverslide

3    project area is highly fragmented from past logging, it makes the area even more susceptible to

4    additional barred owl invasion in the future.

5         In the Beaverslide Project analysis, while recognizing the barred owls' "significant and

6    complex threat to the spotted owl" (BAR007878), the USFS makes no attempt to consider or

7    analyze the potential threat from barred owls that are likely to be present now or acknowledge

8    this increased threat in the future.[13]  *See* BAR012476_68 ("the number of spotted owl territories

9    where barred owls are detected each year continues to increase . . . .").  The USFS' analysis does

10   not include any consideration or analysis of the potential that barred owls have or will colonize

11   the Beaverslide area based on past habitat fragmentation, nor does the analysis discuss how

12   proposed management activities could potentially exacerbate barred owl's displacement of NSOs

13   in the future.  *See generally* BAR007863-7916; BAR007923-7932.

14        Dugger et al. (2011) explain:

15        We believe that the interactions between the species is a form of interference
          competition whereby Spotted Owls are driven from and excluded from their
16        breeding territories by the larger and more aggressive Barred Owl.  Northern
          Spotted Owls are food specialists, which prey on medium-sized arboreal
17        mammals, whereas Barred Owls eat a broader range of prey items, which is likely
          the reason Barred Owl home ranges are 3–8 times smaller than those of Spotted
18        Owls.
          * * *
19        Barred Owls have been documented using a wider range of forest types (younger
          seral stages with more fragmentation) than Spotted Owls.  Consequently, the loss
20        of late successional old-growth forest and increased fragmentation of these forests
          will decrease the amount of suitable habitat for Spotted Owls.

21   BAR012476_67 (scientific citations omitted).  Dr. DellaSala explains the management

22   implications that the USFS and FWS must consider in the Beaverslide Project:

23        While scientific studies on the dispersal of barred owls in spotted owl habitat

24   ─────────────────────────────
      [13] In a more recent response to Plaintiffs' notice of intent to sue prepared for this litigation,
25   the USFS and the Level 1 team both assert that because the more recent surveys did not again
      detect barred owls in the Beaverslide area, it was unlikely that barred owls occupy the project
26   area.  BAR008063_05, _08.  The USFS goes as far as concluding that "The findings in Dugger
      2011 are not applicable to the Beaverslide Project, since there do not appear to be any barred
27   owls occupying the Beaverslide Project area."  BAR008063_08.  The agencies, however, rely on
      the survey of only 2 NSO territories from the 2010 and 2011 surveys, and 11 of the 13 owl
28   territories in the Beaverslide area have not yet been resurveyed.  BAR008063_14, _15.

degraded by thinning, fuel reduction, and other management activities have not yet been published, *it is likely that any degradation of suitable habitat for spotted owls, similar to that from the Beaverslide Project, will increase the competitive pressure from barred owls.* I reach this conclusion based on three findings from the scientific literature. First, barred owls are habitat generalists and can persist in areas where spotted owls cannot or areas that spotted owls avoid. Second, because thinning and other management activities like burning reduce the spotted owl's prey base and spotted owls generally avoid thinned areas, it is likely that barred owls will find reduced competition from spotted owls in these actively managed areas. Finally, because barred owls inhabit other forested areas that lack the structural elements need by spotted owls, and to the extent that more intensive logging continues in these areas, resulting in the displacement of barred owls from those areas, the logging pressure on barred owls that inhabit these areas adjacent to spotted owl habitat will likely drive those barred owls into spotted owl habitat that has been degraded by thinning and other management activities that the spotted owls avoid. My conclusion is supported by peer review of the 2008 and 2011 recovery plans by The Wildlife Society that cautioned FWS about aggressive thinning in owl habitat until empirical studies on impacts to spotted owls, owl prey, and barred owl invasions are conducted.

DellaSala Decl. ¶ 34 (emphasis added). Finally, as Dr. DellaSala observes, fragmentation can also be caused by road construction, even if temporary. DellaSala Decl. ¶ 31. Here, the Beaverslide Project includes 5.3 miles of temporary road construction. BAR007866. But the USFS does not analyze fragmentation in its BA or amended BA from these new roads.

Curiously, while the management approach taken by the USFS (and FWS), focuses on the potential long-term benefits of thinning and other management activities (without analysis of the short-term threats to the NSO's prey base), with respect to the barred owl, the agencies only discuss the short-term threats and ignores the long-term management implications related to the increasing threats from barred owls. BAR008063_08; BAR008063_14, _15.

Because the USFS has failed to consider the new information about increased threats from the barred owl and the long-term management implications from thinning and barred owls on NSOs, the USFS has must reinitiate consultation under ESA § 7. 50 C.F.R. § 402.16(b).

**B.      The USFS Failed to Use the Best Available Scientific Data**

In fulfilling the requirements of Section 7(a)(2) to ensure that the Beaverslide Project is not likely to jeopardize the NSO, the USFS "shall use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). The 2011 RP states that it is based on and was developed using the best scientific information available. FWS201342; FWS201344. Based on the foregoing analysis, the USFS has not used the best available scientific data, including (1)

1    scientific data about the effects from thinning and other management activities on the owl and its

2    prey,[14] (2) scientific data about the need for a more inclusive definition of high quality owl

3    habitat,[15] and (3) scientific data about the effects from the barred owl and management activities

4    that increase competitive pressure on the NSO.[16]

5    **III.    The FWS Violated the ESA by Failing to Use the Best Scientific Data to Critically
         Analyze Short-Term Adverse Effects from Management Activities and Long-Term
6        Effects from Barred Owls on NSOs**

7            Section 7(a)(2) of the ESA requires the FWS, through consultation with the USFS, to

8    insure that the Beaverslide Project is not likely to jeopardize the continued existence of the

9    threatened NSO.  *See* 16 U.S.C. § 1536(a)(2).  The FWS' written concurrences with the USFS'

10   assertion that the Beaverslide Project is "not likely to adversely affect" the NSO must be based

11   on the best available science.  *Id.*; *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d

12   917, 924 (9th Cir. 2008) (the consulting agency evaluates the effects of the proposed action

13   based on the best scientific and commercial data available); *Bennett v. Spear*, 520 U.S. 154, 176

14   (1997) ("The obvious purpose of the requirement that each agency 'use the best scientific and

15   commercial data available' is to ensure that the ESA not be implemented haphazardly, on the

16   basis of speculation or surmise.").  Moreover, incomplete information does not excuse a failure

17   to comply with the statutory requirement of using the best information available.  *Conner v.*

18   *Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988) (citing 16 U.S.C. § 1536(a)(2)).

19           In issuing its written concurrences that the proposed logging was not likely to adversely

20   affect owls, the FWS entirely failed to consider an important aspect of the problem when it did

21   not use the best available scientific data to analyze the short-term adverse effects to the NSO's

22   prey, and did not consider or discuss any potential adverse effects from barred owls or from

23   _____

24   [14] Including studies from the 2011 RP that specifically address the adverse effects of timber
     harvest (primarily thinning operations) on NSOs include:  Forsman *et al.* 1984, Zabel et al. 1992,
     Buchanan et al.1995, Hicks et al. 1999, Meiman et al. 2003, Solis 1983, Sisco 1990, King 1993,

25   Anthony and Wagner 1999, Irwin et al. 2005, Irwin et al. 2008, Irwin et al. 2010; summarized by
     Hansen and Mazurek 2010.  FWS201377.  This also includes studies that specifically address the

26   adverse effects on the NSO's prey from thinning:  Waters et al. 1994, Colgan et al. 1999, Luoma
     et al. 2003, Meyer et al. 2005, Carey et al. 1992, Carey 2000, Wilson 2010, Williams et al. 1992,

27   Innes et al. 2007, Lehmkuhl et al. 2006a.  FWS201378.
     [15] Including studies from the 2011 RP, Recovery Action #10, as well as Forsman et al. 2011.

28   [16] Including studies from the 2011 RP, as well as Dugger et al. 2011.

management activities that are likely to increase competition between barred owls in the

Beaverslide Project area.  Unlike the USFS, which did not consider the 2011 RP in making its

decision, the FWS relied on the 2011 RP, yet failed to take its science into account.

### A.   The FWS Consultation Process Necessarily Includes Both the Letter of Concurrence and the Technical Assistance Letter

Plaintiffs challenge the FWS' entire consultation process, which includes the 2009 Letter

of Concurrence and the response to the USFS' May 2010 Amendment #1 to the BA and project

changes.  *See* FWS201050 (FWS Technical Assistance Letter (or "TAL"), listing all documents

evaluated in the informal consultation reanalysis, including the BA, its Amendment #1, and

project changes).  Because the FWS' TAL considered new information, and makes separate,

final determinations about the threatened NSO and its habitat that have legal consequences, it is

also a "written concurrence" by FWS that the proposed action (as modified) is not likely to

adversely affect NSOs.  The TAL is therefore a decision by FWS whereby "the consultation

process is terminated, and no further action is necessary."  50 C.F.R. § 402.13(a).

The written concurrence in the TAL references the new 2011 RP and adds a conclusion

that the short-term effects from the Beaverslide Project "may affect but not likely to adversely

affect" NSOs (FWS201053).  Although the TAL reaches the same conclusion as the original

2009 LOC, its evaluation of new information and changes submitted by the USFS make the TAL

and the 2009 LOC both distinct final agency actions, challenged here by Plaintiffs.[17]  *See*

*Bennett*, 520 U.S. at 177-178 (holding that a FWS Biological Opinion and Incidental Take

Statement are final agency actions); *see San Francisco Baykeeper v. U.S. Army Corps of Eng'rs*,

219 F. Supp. 2d 1001, 1010 n.4 (N.D. Cal. 2002) ("a letter of concurrence is issued when a

consulting agency determines through informal consultation that the federal action is not likely

---

[17] In several earlier drafts of the TAL, the FWS titles and describes its response letter as "Supplemental Informal Consultation . . . ."  *See* FWS201017-18; FWS201025-27; FWS 201033-35.  It assigns a new consultation file number and then issues its "Concurrence" in draft form.  *Id.*  For all practical effect, and in a statement from the July 21, 2011 version of the letter, the FWS planned to issue the letter as a supplemental concurrence letter.  Then, for unknown reasons, one week before the final letter issued, FWS changed the title to TAL and deleting the "consultation" language.  FWS 201043 (Sept. 2, 2011 draft); FWS 201049 (final TAL issued on Sept. 9, 2011).

to jeopardize listed species or their habitat. *See* 50 C.F.R. § 402.13(a). A letter of concurrence represents final agency action under the ESA.").[18]

### B. The FWS Failed to Provide Critical Analysis and Feedback to the USFS About the Short-Term Effects on NSOs and Their Prey

In its TAL, the FWS asserts that "the action would result in minor, insignificant effects to NSO habitat in the short-term" and then refers to the 2011 RP for the proposition that the silvicultural prescriptions are consistent with the recommendations provided therein. FWS201053. As stated above, the 2011 RP requires that "active management projects [ ] *explicitly evaluate the short-term impacts* to spotted owls *and their prey* while considering the long-term ecological benefits of such projects, *especially in spotted owl core-use areas*." FWS201379 (emphasis added, referring to studies on the previous pages). The science presented there discusses the significant adverse "short-term" direct impacts to owls and the owl's prey from commercial thinning and other management activities. FWS201377-78 (see list of scientific studies in FN14). The USFS failed to consider these studies in its BA (FWS200840-893) or Amendment #1 to its BA (FWS200954-963) because they predate the 2011 RP. The FWS, on the other hand, relied n the 2011 RP, yet none of these scientific findings are ever discussed in the TAL. *See* FWS 201049-054 (the TAL never mentions the word "prey"). *See* Section II.A., *supra*, describing project's "short-term" harm to NSOs and the NSO's prey.

In the Beaverslide area, "[t]welve of the thirteen NSO territories within the planning area are currently below threshold within the 0.7 mile radius and all territories are below threshold within the 1.3 mile radius" below which reproductive success is diminished. FWS200856-57. Yet, the FWS failed to consider the 2011 RP's discussion about direct effects of thinning on NSOs (FWS201377), identification of several studies concerning decreased use by NSO of harvested areas and reduced forage in stands that have been thinned or selectively logged for one to five decades. *See* FWS201377; FWS201408-201409 (discussing the need for more research to evaluate the NSO's response to various management activities, including thinning and

---

[18] *See also Nat'l Wildlife Fed'n v. Harvey*, 440 F. Supp. 2d 940, 947 (E.D. Ark. 2006) (FWS's concurrence that an Army Corps of Engineers' action "would not likely have an adverse impact" on a listed species was final agency action).

Case No.: 3:11-cv-04752-SC – Plaintiffs' Notice of Motion and
Motion and Memorandum in Support of Summary Judgment                      24

1    restoration, to minimize short-term effects and so owls don't abandon their sites).

2         Nor did the FWS consider the conclusive scientific literature about the effects of

3    commercial thinning and burning on the owl's prey species.  *See* Section II.A., *supra*.

4         While acknowledging that commercial thinning in the Beaverslide Project would degrade

5    an additional 850 acres of low and moderate quality N/R habitat and degrade 2,162 acres of

6    foraging habitat (FWS201051), the FWS' TAL and LOC discuss only the long-term benefits to

7    the NSOs from management actions, and give no consideration at all to the short-term adverse

8    effects on the owl's prey base.  *See* FWS200949-200952; FWS 201049-201054.  These

9    concurrence letters, issued in response to the USFS' BA and amendment provide no analysis

10   about the short-term impacts from commercial thinning on the owl's prey.  *See* FWS200949-

11   200952; FWS 201049-201054.  These letters are nearly identical in their discussions as they

12   relate to effects from the Beaverslide Project, although the later TAL does respond to changes

13   made to the Beaverslide project and the amended BA.  FWS201052.[19]

14        In the TAL concurrence, the FWS first provides conclusory analysis about the long-term

15   effects of the project:  "Although this nesting and roosting habitat is considered 'degraded' by

16   the treatments, over the long-term, these treatments will accelerate the development of late-

17   successional characteristics that favor northern spotted owls."  FWS201051.  The FWS then

18   provides a list of reasons why it thinks the degradation of 850 acres of N/R habitat will be

19   insignificant, listing structural elements associated with owl habitat.  *Id.*  But it never mentions,

20   discusses, or analyzes the potential that the owls may avoid this degraded habitat over the short-

21   term (for perhaps several decades), and it never mentions the adverse effects on the owl's prey or

22   how the short-term loss of the owl's prey base (for perhaps 20 years or more) would affect the

23   owl's ability to survive in areas that are already below thresholds for reproductive success.  *Id.*

24   The FWS' discussion of degradation of 2,162 acres of foraging habitat is even more attenuated

25   and is only four lines, admitting only that while there are long-term benefits, foraging habitat

26

27   _____
        [19] Because the conclusions in the earlier LOC are reiterated in the later TAL, Plaintiffs only
28   discuss those made in the TAL.  *See* FWS201052 (providing "Review of Project Impacts . . .
     [b]ased on all of the information provided to the Service and referenced above . . . .").

1    "will be temporarily degraded." *Id.* Further down in its "Recovery Benefits" section, the TAL

2    concurrence letter provides the surprising statement that, "[a]lthough the action would result in

3    minor insignificant effects to northern spotted owl habitat in the short-term, the silvicultural

4    prescriptions are consistent with recommendations provided by the Service in the Revised

5    Recovery Plan for the Northern Spotted Owl (Strix occidentalis caurina) Recovery Plan dated

6    June 28 2011." FWS201053.  The FWS in the TAL fails to document this conclusion, in the

7    absence of information regarding those short-term effects on the owls or their prey.

8           What is perhaps most surprising is that neither the TAL concurrence nor the 2009 LOC

9    ever discuss or analyze the effects of the proposed habitat degradation on the owl's reproductive

10   success or survival, based on the USFS' acknowledgment that all of the owl territories are below

11   the FWS' recommended thresholds.  *See* BAR007881.  The 2009 LOC acknowledges that the

12   territories are below 500 and 1,340 acres with respect to N/R habitat in the core areas, but it

13   never discusses or analyzes how this relates to the potential that any further reduction or

14   degradation might reduce reproductive success or affect survival.  FWS200950.  The TAL makes

15   no mention of the N/R thresholds and fails to include any discussion or analysis about them.

16          Without an explicit evaluation of the short-term impacts to NSOs and their prey

17   "especially in spotted owl core-use areas" (FWS201379), it appears likely that implementation of

18   the Beaverslide Project will "likely adversely affect" the NSOs in the Beaverslide Project area.

19   DellaSala Decl. ¶¶ 13, 19.  Yet, the FWS failed to reach this conclusion, ignored the 2011 RP

20   best available data, and without scientific basis concluded just the opposite, that the Beaverslide

21   Project would "not likely adversely affect" the NSO.  FWS201053.  Without this scientific basis,

22   the FWS' determination is arbitrary and capricious because by failing to consider the owl's prey

23   base, it has "entirely failed to consider an important aspect of the problem . . . ." *City of*

24   *Sausalito*, 386 F.3d at 1206.  Moreover, the FWS failed to use the best scientific data from the

25   2011 RP on the short-term effects on the owl's prey base, which is "otherwise not in accordance"

26   with § 7(a)(2) of the ESA.

27          **C.      The FWS Failed to Provide Critical Analysis and Feedback to the USFS
                    About the Effects from Barred Owls and Related Management Activities on
28                   NSOs**

The FWS has "entirely failed to consider an important aspect of the problem" by overlooking the present and future effects from the barred owl and the potential adverse effects from the Beaverslide Project that may cause a future increase in competitive pressure from barred owls on resident NSOs.  Because the FWS relied on the 2011 RP, it had an obligation to consider it and use it as best available science.  "This Revised Recovery Plan is based on the best scientific information available . . . ."  FWS201342 (2011 RP); *see Wild Fish Conservancy v. U.S. Environmental Protection Agency*, 2010 U.S. Dist. LEXIS 41838, *16 (W.D. Wash. Apr. 28, 2010) (because recovery plans constitute the best available science, the agencies' failure to use them in reaching their decision that formal consultation was unnecessary ran afoul of the ESA).  By ignoring its core provisions, the FWS has failed to use the best available scientific data to determine whether the project would adversely affect NSOs.

The 2011 RP identified the serious and greater threat of the barred owl to the NSO.  FWS201332; FWS201347.  Barred owls have been found in all areas where surveys have been conducted for NSOs and the FWS "assumes barred owls now occur at some level in all areas used now or in the past by spotted owls."  FWS201348.  Further, "the number of spotted owl territories where barred owls are detected each year continues to increase . . . ."  BAR012476_68.  In fact, "[a] barred owl pair was detected once during the 2008 NSO surveys in AC #3 which is deficient in both N/R and foraging (F) habitat."  FWS200856.  But neither FWS concurrence letter ever mentions the barred owl in general or responds to the barred owl pair detection mentioned in the BA specifically.  *See* FWS200949-200952; FWS 201049-201054.

The barred owl is currently displacing NSOs from its historical breeding territories and that the extinction probability of pairs of NSOs triples when compared to areas where barred owls were not present.  BAR012476_65.  Even when habitat for NSOs is available, the probability that NSOs will colonize this habitat is greatly diminished when barred owls are present.  BAR012476_65-66.  The fragmentation from past logging of older forests that the NSO prefers has likely had the indirect effect of allowing the barred owl, which can live in younger and more fragmented forests, to move into the NSO's range.  BAR012476_65-67.  Dugger et al.

(2011) explain:

> Barred Owls have been documented using a wider range of forest types (younger seral stages with more fragmentation) than Spotted Owls.  Consequently, the loss of late successional old-growth forest and increased fragmentation of these forests will decrease the amount of suitable habitat for Spotted Owls.

BAR012476_67 (scientific citations omitted).  But the FWS' never considers or analyses the potential that barred owls have or will colonize the Beaverslide area due to significant habitat fragmentation from past logging and NSO habitat destruction, nor does the FWS consider or discuss how proposed management activities could potentially exacerbate barred owl's displacement of NSOs in the future.  *See* Section II.C., *supra*, describing the effects from barred owls and competitive pressure from management.

The FWS' failure to consider an important aspect of the problem with the barred owl and its failure to consider the best scientific data available in the 2011 RP and in the Dugger et al. (2011) findings is fatal to the FWS' written concurrences.  For those reasons, the FWS' concurrence letters are arbitrary and capricious and otherwise violate the ESA and the APA.

## IV.   The USFS Failed to Consider the Direct, Indirect, and Cumulative Effects of the Beaverslide Project, in Violation of NEPA

The USFS has violated NEPA by failing to take a "hard look" at the environmental consequences of the Beaverslide Project.  In particular, the Final Environmental Impact Statement  ("FEIS") and Final Supplemental Environmental Impact Statements ("FSEIS") fail to analyze potential direct, indirect, and cumulative impacts of the proposed action on the NSO, its prey, from the effects of barred owls and management activities.

The primary purpose of an EIS "is to serve as an action-forcing device to insure that the policies and goals defined in the [NEPA] are infused into the ongoing programs and actions of the Federal Government."  40 C.F.R. § 1502.1.  NEPA requires federal agencies to analyze the direct, indirect, and cumulative impacts of the proposed action.  40 C.F.R. §§ 1508.7, 1508.8; *see* 42 U.S.C. 4332(2)(C).  "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA."  40 C.F.R. § 1500.1(b).  NEPA establishes procedural requirements to ensure that agencies takes a "hard look" at the environmental impacts of their actions, including the consideration of all foreseeable direct and indirect impacts and a

1  candid discussion of adverse impacts—one that does not improperly minimize negative side

2  effects.  *Earth Island Institute v. U.S. Forest Service*, 442 F.3d 1147, 1154, 1159 (9th Cir. 2006)

3  ("*Earth Island II*"); *see Northwest Resource Info. Ctr. v. National Marine Fisheries Serv.,* 56

4  F.3d 1060, 1066 (9th Cir. 1995) (courts must "ensure that the agency took a 'hard look' at the

5  environmental consequences of its action").  "General statements about 'possible' effects and

6  'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive

7  information could not be provided."  *Neighbors of Cuddy Mt. v. U.S. Forest Serv.*, 137 F.3d

8  1372, 1380 (9th Cir. 1998).  In considering effects, "some quantified or detailed information is

9  required.  Without such information, neither the courts nor the public, in reviewing the Forest

10  Service's decisions, can be assured that the Forest Service provided the hard look that it is

11  required to provide."  *Id.* at 1379.

## A.     The USFS Failed to take a Hard Look at the Short-Term Effects on NSOs and Their Prey

13        The SFEIS contains no analysis of direct and indirect impacts to the NSOs or their habitat

14  needs, and relies on the FEIS for this impacts analysis.  BAR000630 (referring to FEIS'

15  "Wildlife" section).  The FEIS Wildlife section states that "[t]he direct and indirect effects that

16  may be caused by the action alternatives on threatened, endangered, proposed, and candidate

17  species were discussed in detail in the biological assessment . . . ."  BAR000293.  *See* Section

18  II.A., *supra*, regarding the USFS' failure to consider short-term effects on NSOs and their prey.

19        The FEIS acknowledges "that northern spotted owl productivity and survivorship are

20  reduced" when N/R habitat drops below the FWS' thresholds, as discussed *supra*, and that all

21  NSO activity centers are below these thresholds.  BAR000294.  Moreover, while the analysis

22  admits that "[t]imber harvest and associated management activities may have a short-term

23  negative effect on northern spotted owl by modifying suitable northern spotted owl habitat"

24  (BAR000295), it never provides the necessary "hard look" to determine whether this short-term

25  negative effect could cause additional reductions in "productivity and survivorship" in these

26  below-threshold activity centers.  Moreover, it never discusses the potential adverse indirect

27  effects from the short-term reduction in the NSO's prey base.  *See* BAR000296-309.

28

The FEIS does tout the project's " 'long-term benefits for spotted owls (e.g. thinning of younger forests and fire risk reduction) . . . even if they cause short term negative effects.' " BAR000296 (citing the 2008 NSO Final Recovery Plan, p. 20); *see also* BAR000297-299 (discussing the long-term benefits of jackpot burning).  The USFS makes numerous conclusory statements, but never provides any quantifiable or detailed "hard look," *Neighbors of Cuddy Mt.*, 137 F.3d at 1372, at the environmental consequences of the actions:

> Any disturbance or understory reduction will be short term in nature . . . . (BAR000299)

> Retention guidelines should maintain the prey base in developing young stands especially dusky-footed woodrats and flying squirrels, potentially leading to foraging and roosting use by northern spotted owls.  BAR000301.

> Foraging habitat will be affected in the short term as understory vegetation and some midstory vegetation (up to 12 inches in diameter) would be removed from the landscape and some downed logs would be consumed from the jackpot burning.  However owls will forage again within the burned areas once the understory vegetation begins to grow again (USDA Forest Service 1985). BAR000303.

But there is no disclosure that flying squirrels many not again use these areas for 20 years or the owls may not again forage in these areas again for decades, or that  this may lead to a loss of productivity or survivorship.  *See* DellaSala Decl. ¶¶ 13-16 (explaining harm to the owls). Oddly, three of the scientific studies discussed in the 2011 RP, which discuss the effects of thinning on the owl and its prey (*see* FN14, *supra*), are included in the USFS' administrative record for this case:  Forsman et al. 1984 (BAR008200); Meiman et al. 2003 (BAR010547); and Carey et al. 1992 (BAR009132), but none of them are cited or referenced in the FEIS or SFEIS.[20] In discussing the Meiman study, Forest Service Employees for Environmental Ethics noted:

> The fundamental problem with the DEIS's analysis is that it fails to consider any effect that commercial thinning would have on the spotted owl itself–Its analysis is limited to counting acres of habitat. In fact, the DEIS ignores completely the most relevant and best scientific information available—a peer reviewed scientific study of the effect commercial thinning has on the northern spotted owl.  Meiman et al. tracked a radio tagged adult male spotted owl before and after commercial thinning in its home range.  After thinning, the spotted owl shifted its habitat use away from the thinned area and significantly expanded its non-breeding home

---

[20] Plaintiffs raised the issues about the effects of thinning on the owls and their prey in their comments on the FEIS and SFEIS as well as appeal of the Beaverslide decision.  *See* BAR001307; BAR001308; BAR001393; BAR001390; *see also* BAR001655-56 (appeal point re Meiman et al. 2003).

range.  The authors explained that "short-term changes in behavior patterns that require resident owls to expend more energy by maintaining larger home ranges and traveling greater distances to forage may reduce survival productivity and occupancy at that site."

BAR001271 (footnote omitted; quote at BAR010555).  Also, the Carey et al. 1992 study ("Northern Spotted Owls: Influence Of Prey Base And Landscape Character") provides relevant information about the habitat needs of the owl's prey.  The abstract states:  "The most important prey species, the northern flying squirrel, was twice as abundant in old forest as in young forest in all areas."  BAR009133.  Yet, the USFS makes no attempt to quantify or provide the necessary detailed look at the potential adverse effects on the owl and its prey in its EISs.

Here, the USFS failed to take a hard look at the direct and indirect impacts of thinning and other management activities on the NSOs and their prey base in already degraded activity centers, which is unreasonable, arbitrary, capricious, and otherwise in violation of NEPA.

## B.  The USFS Failed to Consider Effects from Barred Owls and Management Activities that Could Increase Competition with the NSO

The FEIS and SFEIS fail completely to consider the significant threats that barred owls already cause, which are likely to increase in the future.  In doing so, the USFS has failed to consider an important aspect of the problem.  *See* Section II.C., *supra*, discussing the potential threats from barred owls.

The FEIS and SFEIS chapters do not mention the barred owl or management actions that may address barred owl threats.  Instead, the barred owl is only mentioned in response to comments.[21]  First, the FEIS's response refers to the BA and repeats the very limited discussion there, that a barred owl pair was detected, that no other barred owls were detected in the 2008 and 2009 survey, and that there was no response from the NSO during any of the surveys.  BAR000485.  It then makes the assertion that by project design, no thinning would occur in high quality N/R habitat, that the project follows Recovery Action ("RA") #32 from the 2008 RP, and that "[t]he retention of all high quality habitat will make it harder for barred owls to compete in

---

[21] *See* Plaintiffs' comments and appeal:  BAR001307; BAR001346; BAR001347; BAR001656 (appeal point about management implication of barred owls on NSOs in the project area).

this habitat." *Id.*; *see also* BAR000671 (similar response in SFEIS).

The USFS' statement in the FEIS is fallacious and shows that the USFS misunderstands the issue raised and the meaning of RA #32. **First**, RA #32 only applies to what the USFS calls "high quality" N/R habitat, but the comment is about the management proposed in the less-than-ideal "low and moderate" N/R habitat because that is the only type of N/R habitat where the commercial thinning and other management activities are proposed. **Second**, RA #32 actually states: "[p]rotecting these forests will not further exacerbate competitive interactions between spotted owls and barred owls as would occur if the amount of shared resources were decreased." BAR012341. In other words, RA #32 clearly infers that the decrease of shared resources from management activities may exacerbate competitive interactions between NSOs and barred owls. This inference is consistent with the scientific findings and opinion expressed in Section II.C., *supra*, that the commercial thinning and other management activities in the activity centers may exacerbate the competitive interactions between NSOs and barred owls. **Third**, the USFS has given no consideration to the fact that the threat from the barred owl is increasing range-wide and will likely increase in the Beaverslide area due to fragmentation and additional habitat manipulation from thinning and other activities. *See* DellaSala Decl. ¶ 34 (barred owls find reduced competition in degraded areas because those are areas NSOs avoid, and increasing populations of barred owls and outside pressure drive barred owls into these degraded areas).

Here, the USFS failed to take any real look—and certainly not a hard look—at the potential adverse effects from barred owls on NSOs and has failed to consider that management activities in the activity centers may exacerbate the competitive interactions between NSOs and barred owls, which is unreasonable, arbitrary, capricious, and otherwise in violation of NEPA.

## V. The USFS Failed to Comply with the SRNF Plan and Failed to Ensure the Diversity of Species, in Violation of the NFMA

### A. Species Diversity, MIS Monitoring, and the Six Rivers National Forest Plan

The USFS manages the national forests pursuant to its duties and obligations under the NFMA. 16 U.S.C. § 1600 *et seq.* One of these duties is the duty to "provide for diversity of plant and animal communities." 16 U.S.C. § 1604(g)(3)(B). The Forest Service uses

management indicator species ("MIS") to gauge the effects of management activities on plant and animal communities and to satisfy NFMA's diversity requirement.  An MIS species is a bellwether, or class representative, "for other species that have the same special habitat needs of population characteristics."  *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 762 n. 11 (9th Cir.1996).

Management occurs at both the forest level and the individual project level.  At the forest level, the Forest Service develops a Land and Resource Management Plan ("LRMP" or "forest plan"), which is a broad, long-term planning document for an entire national forest.  "These plans operate like zoning ordinances, defining broadly the uses allowed in various forest regions, setting goals and limits on various uses . . . but do not compel specific actions."  *Citizens for Better Forestry v. U.S. Forest Serv.*, 88 F.3d 754, 757 (9th Cir.1996).  At the project level, NFMA mandates that site-specific projects (such as resource plans, permits, contracts, or other instruments for occupancy and use of forest lands) "shall be consistent with the land management plans."  16 U.S.C. § 1604(i).  Once a forest plan is approved, the Forest Service implements the plan by approving or denying site-specific actions.  *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1092 (9th Cir.2003).

Thus, the Beaverslide Project must be consistent with the governing forest plan, here the 1995 SRNF LRMP.  BAR012710.  To ensure species diversity and viability, the SRNF LRMP requires the USFS to monitor populations of MIS and designates specific MIS for monitoring:[22]

> Maintain viable populations of all native and desirable non-native wildlife species occurring on the Forest . . . .  The Forest will focus on this goal through the monitoring and protection of selected Management Indicator Species (MIS), whose population status and trends are assumed to reflect: (1) the overall health and integrity of their respective biotic assemblage or community as a whole, and (2) community-level responses to management related disturbances.

BAR012847.

> **Management Indicator Species:** Six individual MIS species and seven multi-species assemblages were selected to gauge the effects for each alternative proposed in this EIS and to monitor the effects of plan implementation.  Each

---

[22] Plaintiffs raised these MIS monitoring issues in its comments and its administrative appeal. *See* Comments at BAR001218-20; BAR001301-04; BAR001348; BAR001356; Appeals at BAR001657-58; BAR001665-68.

species within the multi-species assemblages is likely to respond somewhat differently to various management activities that may occur.  Monitoring several similar species will provide a better reflection of the range of responses expected from all wildlife species associated with a given habitat or habitat element.

BAR012734.  "Population viability of sensitive species is also a concern.  The Forest must evaluate the distribution, status, and trend of both populations and their habitat . . . ." BAR013022.  Species with viability concerns that depend on mature or old growth forest with abundant snags are NSO, Pacific fisher, American marten, and northern goshawk.  BAR012849.

In order to ensure viable populations and sufficient habitat for these sensitive species, the USFS monitors MIS with similar habitat needs.  In the SRNF Forest Plan, these MIS are Pacific fisher, American marten, pileated woodpecker, and NSO (which all need mature and old growth forests) and the Snag Assemblage, which includes the western screech owl.  BAR012848.  The LRMP explains how MIS were selected and the SRNF's monitoring approach:

> Many MIS occupy a niche in their particular assemblage that is either highly dependent on other members for food, or may be extremely sensitive to management related disturbance, or both.  Other MIS were selected based on concern for their current population status.  It is assumed that, with current knowledge, these MIS are indicative of the integrity of communities as a whole, where they serve to focus the Forest's monitoring and feedback loop, and provide an assessment of the overall health of the represented habitats/ecosystems.  They serve as the primary measure of the biological diversity trend on the Forest.

BAR012847.  Monitoring and MIS analyses on the SRNF are done either by monitoring the habitat of a specifically identified MIS to determine the MIS species' health or by monitoring the habitat of an MIS as a representative proxy for the health of other species with similar habitat types which the MIS is said to represent.  The latter is known as the "proxy-on-proxy" approach. *See Lands Council v. McNair*, 537 F.3d 981, 987-88, 992 (9th Cir. 2008) (*en banc*) (when the USFS utilizes a proxy approach it "nevertheless must both describe the quantity and quality of habitat that is necessary to sustain the viability of the species in question and explain its methodology for measuring this habitat.").

> The purpose of monitoring MIS is to estimate the effects of proposed management activities on fish and wildlife populations.  *Inland Empire,* 88 F.3d at 754 n. 11.  MIS are selected as proxies for other species that have the same habitat needs or population characteristics.  *Id.* . . .  [T]he Ninth Circuit has permitted the use of this so-called "proxy-on-proxy" approach so long as certain conditions are satisfied.  "Our case law permits the Forest Service to meet the wildlife species viability requirements by preserving habitat, but only where both

the Forest Service's knowledge of what quality and quantity of habitat is
necessary to support the species and the Forest Service's method for measuring
the existing amount of that habitat are reasonably reliable and accurate." *Native
Ecosystems Council v. Dombeck,* 428 F.3d 1233, 1250 (9th Cir.2005) . . . .

*Conservation Cong. v. U.S. Forest Serv.*, 555 F. Supp. 2d 1093, 1096 (E.D. Cal. 2008) ("*CC v.
USFS*").  In addition, this "habitat monitoring is only permissible where two conditions are
satisfied: first, there must be an accurate and reliable correlation between habitat health and
species health, and second, the methodology for measuring habitat must also itself be accurate
and reliable." *Id.* (citing *Native Ecosystems Council,* 428 F.3d at 1250 ("*NEC I*"); *Gifford
Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378 F.3d 1059, 1066 (9th Cir. 2004) ("The
test for whether the habitat proxy is permissible . . . is whether it 'reasonably ensures' that the
proxy results mirror reality.")); *see Lands Council*, 537 F.3d at 998-999 ("*Native Ecosystems
Council* remains good law: the Forest Service may meet wildlife 'viability requirements by
preserving habitat, but only where both the Forest Service's knowledge of what quality and
quantity of habitat is necessary to support the species and the Forest Service's method for
measuring the existing amount of that habitat are reasonably reliable and accurate.' ").

Recently, however, the Ninth Circuit has clarified that,

[t]he proxy-on-proxy approach's reliability is questionable where the MIS is
absent from the project area.  Regardless of whether the Forest Service's
methodology comports with established scientific standards, the habitat proxy
"does not reasonably ensure viable populations of the species at issue," when
almost no [MIS] have been seen in the project area for fifteen years.

*Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 933 (9th Cir. Mont. 2010) ("*NEC II*").

Here, in order to ensure the viability of those species which depend on mature or old
growth forest with abundant snags—NSO, Pacific fisher, American marten, and northern
goshawk—and to ensure the diversity of wildlife habitats on which they depend, the USFS must
have reliable monitoring data for the MIS the USFS has selected to represent these species'
habitats—Pacific fishers, American martens, pileated woodpeckers, and the Snag Assemblage,
represented by the western screech owl.

### B.     The USFS Has Failed to Provide Accurate and Reliable Data to Ensure it Meets its Monitoring, Viability, and Diversity Requirements

The USFS does not met the standards of *Lands Council* and both *NEC I and NEC II* for

reliability of MIS monitoring data in both the SRNF and in the Beaverslide Project area, because the correlation between the MIS's habitats and the MIS's health for a number of species is not reasonably reliable or accurate and because two MIS species have not been seen in the area for many years, if ever.  *See CC v. USFS*, 555 F. Supp. 2d at 1096 (explaining how *Gifford Pinchot*, 378 F.3d at 1066-67, is instructive in demonstrating "an accurate and reliable relationship between habitat health and species health . . . ."); *NEC II*, 599 F.3d at 933.

The facts and analysis in *CC v. USFS* and *NEC II* are most instructive and apply to each of two separate groups of MIS at issue in this case.

### 1.    Western Screech Owls and the Snag Assemblage

Because the MIS western screech owl, representing the snag assemblage, has essentially no data for the project or planning area, and trends for other snag assemblage species are mixed, there is no accurate or reliable basis to evaluate the USFS' assertions that these species' habitats are sufficient to ensure diversity or sustain viable populations of other species.

In *CC v. USFS*, as here, the USFS had selected habitat assemblages based upon the types of habitat present in the project area.  555 F. Supp. 2d at 1102.  The USFS then analyzed the proposed action in terms of its potential impact on each selected habitat assemblage and supplemented its habitat monitoring by selecting certain individual species and analyzing the potential effects of the project in relation to population trends for the selected species.  *Id.* at 1102-03.  There, plaintiffs argued that the USFS failed to document a sufficient relationship between habitat health and species health for three species:  the mule deer (Open and Early Seral and Multi-Habitat assemblages), the white-breasted nuthatch (Hardwood assemblage), and the red-breasted nuthatch (Late Seral and Snag and Down Log assemblage), selected because they were found within the project area, the populations were known to be sensitive to habitat quality, and there was a high confidence population trend data for each.  *Id.*

For the white-breasted nuthatch, the court found an appropriate correlation between the species' habitat and its population.  *Id.* at 1104.  But for the mule deer, the USFS stated that "[c]urrently, the available data is not sufficient to conclude the causes of the decline."  *Id.* at 1103.  This "admitted uncertainty makes proxy-on-proxy analysis inappropriate."  *Id.*  For the

red-breasted nuthatch, the USFS found that inconsistently significant statistical data in different habitat strata and scales made it "hard to conclude that there is any significant relationship between forest wide increases in late seral assemblage habitat type and population trends for the red-breasted nuthatch." *Id.* at 1104.  The court concluded that the USFS could not show that the habitat for the mule deer and red-breasted nuthatch correlated with the managment impacts on the species' populations, and therefore habitat monitoring was inappropriate.  *Id.* at 1103-04.

Similarly, here, the USFS cannot show that habitat for the Western screech owl and other species in the snag assemblage correlates with the management impacts on the species' populations.  The reason this is important in the Beaverslide Project area is because sensitive species such as the northern goshawk, NSO, American marten, and Pacific fisher depend on adequate snag habitat.  If adequate snag habitat does not exist in the Beaverslide Project area, simply retaining existing snags may not be enough.  *See* BAR000535.  "Thinning reduces the stand density of trees to improve growth and yield, enhance stand health and reduce potential mortality."  BAR000280.  But a reduction in mortality from the thinning, as proposed in this project, also reduces future snag recruitment and will add further to a deficit of snag habitat.

Just as in *CC v. USFS*, the Western screech owl represents a habitat assemblage, in this case, the Snag Assemblage, because of its association with snags (standing dead trees) and tree cavities.  BAR000331.  The Western screech owl is strictly nocturnal and does not vocalize just before sunrise when sampling is done by the Breeding Bird Survey ("BBS").  BAR000332. Hence, there is very little data available for the entire screech owl complex (citing the BBS), even though it has been picked up in other surveys for NSOs and goshawks in the Mad River Ranger District.  *Id.*  The MIS analysis concludes:  "According to the 2007 research conducted on MIS data collection results were inconclusive with more work needed to be done on analyzing the data."  *Id.*; *see also* BAR011416 (trend analysis for the Western screech owl: "Our call count data are the only data available; not completely analyzed yet.").  Moreover, the overall conclusion for the snag assemblage states that "[p]opulation trends for species in this assemblage range from decreasing to increasing with some species having stable trends."  BAR000335.  But a closer look at the data from the 2007 trend analysis shows that only two of the eight Snag

Assemblage species show population increases at a local scale, and six show either local

decreases, no data at the local scale, or no data at any scale.  *See* BAR011413-14.[23]

The following table summarizes the trends of snag assemblage species:

|                           | Locally                | Forest     | Regionally |
|---------------------------|------------------------|------------|------------|
|                           |                        | Trends     |            |
| Snag Assemblage Species   | Locally                | Forest     | Regionally |
| Red breasted sapsucker    | increasing             | increasing | increasing |
| Whiteheaded woodpecker    | increasing             | decreasing | no data    |
| Downy woodpecker          | decreasing             | increasing | decreasing |
| Hairy woodpecker          | decreasing             | increasing | increasing |
| Brown creeper             | decreasing             | decreasing | decreasing |
| Vaux's swift              | no data                | stable     | decreasing |
| Flammulated owl           | no data at any scale[24] |          |            |
| Western screech owl       | no data at any scale   |            |            |

Just as in *CC v. USFS*, these mixed results and admitted uncertainties, especially at the

local scale where MIS species trends are most important in measuring management impacts,

make the proxy-on-proxy analysis here inappropriate.[25]  The only conclusion that can be reached

is that the USFS does not have accurate and reliable data to show that snag habitat trends are

stable or increasing, to ensure there is enough snag habitat to maintain viable populations of

sensitive species or to ensure diversity.

> ## 2.   Pacific Fishers, American Martens, Pileated Woodpeckers, and Old Growth and Mature Forest Habitats

Because the MIS Pacific fisher, American marten, and pileated woodpecker are

essentially absent from the project and planning area, there is no basis to evaluate the USFS'

assertions that these species' habitats are sufficient to sustain viable populations either

individually or for other species that depend on old growth or mature forest habitats, such as the

---

[23] The USFS has reported some of its MIS monitoring results in its MIS Report (BAR007806-7822), which are restated in the FEIS (BAR000323-339).  The administrative record also contains an MIS trend analysis from 2007.  BAR011412.  The analysis' data, however, was only referenced and not included in the EIS analysis.  BAR000324.  Moreover, it is limited to avian species.  *Id.*

[24] "There is essentially no data on population trends for this species according to Partners in Flight (PIF)."  BAR000331.

[25] These mixed results and lack of data make it difficult to conclude that there is any significant relationship between the snag assemblage habitat type and population trends for the western screech owl or five of the other species in the snag assemblage.

1   northern goshawk,[26] which is designate a sensitive species and also needs abundant large snags.

2   BAR000313.  The fisher, marten, and pileated woodpecker, together with the NSO, serve as MIS

3   proxies for old growth and mature forest habitat, but two of these are in decline, range-wide and

4   in northwest California—NSO (BAR000326) and fisher (69 Fed. Reg. 18,770 (April 8, 2004)—

5   and three of these have no data in the project area—fisher, marten, and pileated, *see infra*.

6       In *NEC II*, the USFS provided no basis to evaluate its assertion that the sagebrush habitat

7   in the project area was sufficient to sustain viable sage grouse populations when sage grouse

8   could not be found in the project area.  599 F.3d at 933.  The court held the agency to its

9   statutory responsibility to fully study the effects of the planned agency action because the USFS

10  was required to maintain viable populations of *existing* species.  *Id.* at 934.  It exclaimed that

11  "[i]t is unfathomable how the Forest Service could meet its responsibility to maintain existing

12  species by selecting as a proxy a species that is virtually non-existent in the targeted area."  *Id.*

13      There are many parallels in the facts about fishers, martens, and pileated woodpeckers

14  here when compared to the facts about sage grouse in *NEC II*.  There, the sage grouse, which is

15  entirely dependent on sagebrush ecosystems, has trended downward in southwestern Montana

16  for the past decade.  *NEC II*, 599 F.3d at 930.  The USFS identified no breeding sites in the

17  project area with the closest about eleven miles away, and only two anecdotal sage grouse

18  sightings in the past fifteen years, even though approximately 40% of the project area was

19  considered sage grouse habitat.  *Id.*  The Forest Plan designated the sage grouse as an MIS and

20  contemplated monitoring it to measure the effect of management activities on representative

21  wildlife habitats.  *Id.* at 933.  The Ninth Circuit explained that "[t]here is simply no basis to

22  evaluate the Forest Service's assertion that the sagebrush habitat is sufficient to sustain viable

23  sage grouse populations when sage grouse cannot be found in the project area."  *Id.*  Because the

24  habitat proxy failed to track the MIS population, the approach was unreliable in ensuring overall

25

26      [26] Three goshawk territories were detected in a single 2008 survey with active nests within or
    adjacent to the Beaverslide project area.  BAR000314.  But the FEIS presents no population or
27  habitat trend data and concludes that the project "[m]ay impact individuals but will not cause a
    trend towards federal listing."  BAR000313.  "Goshawks in northern California prefer mature
    and old growth conifer forest."  *Id.*  Moreover, goshawk "[m]oderate and high quality habitats
28  contain abundant large snags . . . ."  *Id.*

diversity.  *Id.* at 935.  And in using this approach to evaluate whether the project complied with

its duty to ensure wildlife diversity, the USFS did not adequately consider evidence that the sage

grouse population continued to trend downward over several decades.  *Id.* at 935.

> This omission on the part of the Forest Service would suggest that the agency has "failed to consider an important aspect of the problem," or has offered an explanation for its decision that runs counter to the evidence in the record, and its decision is therefore arbitrary and capricious.

*Id.* (citing *Motor Vehicle Mfrs. Assn., Inc.* 463 U.S. at 43).

Here, in addition to its status as an MIS, the Pacific fisher is designated a sensitive

species, and the FWS has categorized the fisher as candidate species for listing as a threatened

species under the ESA due to its range-wide population declines.  BAR000290; 69 Fed. Reg.

18,770.  The fisher's preferred habitat is mature dense forest (BAR000327), and this habitat

occurs in the planning area that may be affected by project activities.  BAR000325 (Table 36).

Of the approximately 3,352 acres of suitable fisher habitat in the Beaverslide Project area, 349

acres will be thinned and 502 acres will receive fuel treatments, which may have a negative

effect on fisher habitat.  BAR000310.  But no surveys have been conducted for the Pacific fisher

within the planning area.  *Id.*  Fisher surveys were conducted throughout the Cedar Gap portion

of the Upper Mad River Watershed from 2004-2006, which identified 59 rest sites and 1 den site

within the watershed, although there are no known natal dens within the planning area.  *Id.*  The

FEIS does not state whether any fishers were detected.  The analysis concludes that "[b]ecause

no individual fishers are known to occupy the planning area there will be no effect on population

trends and due to project design there will be no effect on habitat trends."  BAR000327.

Just like fishers, American martens prefer mature and old growth forest.  BAR000328.

Surveys conducted from 1993 to 1997 did not detect marten on the Mad River Ranger District

and no species-specific surveys have been conducted for marten within the Beaverslide planning

area.  *Id.*  There is one historic unconfirmed incidental observation of marten in the Forest

Wildlife Sighting Database.  *Id.*  Fisher and marten have similar physical characteristics and can

easily be confused by the untrained observer, and based on the known presence of fisher and lack

of detections of marten on the District, it is likely that this observation was a misidentified fisher.

1    *Id.*  Again, the analysis concludes that "[b]ecause this species does not occur there will be no

2    change in population trends."  BAR000329.

3        Finally, the pileated woodpecker's habitat is similar to that of the NSO and the Pacific

4    fisher:  mature and late successional forests with abundant snags.  BAR000326.  Although there

5    were several anecdotal detections of the species in the area, there are no known nesting or

6    roosting sites for this species within the planning area, and no project-specific surveys for this

7    species have occurred in the project area.  *Id.*  The only survey data is from a BBS route in

8    another part of the forest, and data on anecdotal sightings is recorded only for the Mad River

9    Ranger District as a whole.  *Id.*  Trends are mixed, with increases locally, decreases at the forest

10   scale, and increases regionally.  BAR011413.  Based on this data, the MIS analysis concludes

11   that the population of pileated woodpeckers is stable and project activities "will not lead towards

12   reversing this trend and will likely not cause a decreasing population trend."  BAR000327.

13       Just as in *NEC II*, here the USFS has provided no basis to evaluate its assertion that there

14   is sufficient fisher, marten, or pileated woodpecker habitat to sustain viable populations for

15   species with similar habitats when fishers, martens, and pileated woodpeckers could not be found

16   or were only anecdotally reported in the planning area.  *See* 599 F.3d at 933.  Because of this, the

17   USFS' habitat proxy is unreliable and cannot reasonably ensure viable populations.  *Id.* at 933,

18   935.  It is therefore arbitrary and capricious.

19       Therefore, the USFS has failed to comply with the MIS monitoring and viability

20   requirements of the SRNF LRMP, and has failed to ensure the diversity of animal communities,

21   which is otherwise not in accordance with the NFMA.  16 U.S.C. §§ 1604(i); 1604(g)(3)(B).

22   **VI.    Plaintiffs' Are Entitled to Declaratory and Injunctive Relief**

23       In addition to declaratory relief, permanent injunctive relief is a proper remedy for

24   violations of the ESA, NEPA, and NFMA.  The court "shall . . . set aside" agency action that is

25   "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," such as

26   for violations of the ESA, NEPA, and NFMA.  *See* 5 U.S.C. § 706(2).

27       Plaintiffs who seek a permanent injunction that does not involve the ESA, such as for

28   violations of NEPA and NFMA, must demonstrate: (1) irreparable injury; (2) inadequacy of legal

remedies, such as monetary damages; (3) that an equitable remedy is warranted, considering the balance of hardships between the plaintiff and defendant; and (4) that a permanent injunction would not disserve the public interest. *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2756 (2010). With the ESA, however, Congress altered the traditional injunction standard to ensure protection of endangered and threatened species, and "the balance has been struck [by the ESA] in favor of affording endangered species the highest of priorities." *TVA v. Hill*, 437 U.S. 153, 194 (1978).[27] "The [ESA] [] does not permit courts to consider the hardship an injunction may impose on the project if endangered species' habitat is likely to be destroyed." *Marsh*, 816 F.2d at 1387. Thus "[i]n cases involving the ESA, Congress removed from courts their traditional equitable discretion in injunction proceedings of balancing the parties' interests." *Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*, 23 F.3d 1508, 1510–11 (9th Cir. 1994); *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 794 (9th Cir. 2005) (holding that traditional analysis involving weighing of economic harm "does not apply in ESA cases because Congress has already struck the balance").

"[T]he appropriate remedy for violations of the ESA consultation requirements is an injunction pending compliance with the ESA." *Washington Toxics*, 413 F.3d at 1034 (citing *Thomas v. Peterson,* 753 F.2d at 764). In part, this is because the purpose of the consultation process "is to prevent later substantive violations of the ESA." *Id.* (citing *Marsh,* 816 F.2d at 1389). When reinitiation is required, "[i]t is the action agency's burden to show the absence of likely adverse effects on listed species." *Forest Guardians v. Johanns*, 450 F.3d 455, 463 (9th Cir. 2006). "Placing the burden on the acting agency to prove the action is non-jeopardizing is consistent with the purpose of the ESA and what we have termed its 'institutionalized caution mandate[ ].' " *Washington Toxics*, 413 F.3d at 1035 (quoting *Marsh*, 816 F.2d at 1389).

"In the NEPA context, irreparable injury flows from the failure to evaluate the environmental impact of a major federal action." *Sierra Club v. Bosworth*, 510 F.3d 1016, 1034

---

[27] *Winter* does not alter the *TVA* standard because *Winter* involved an injunction issued under NEPA, rather than the ESA. Moreover, *Monsanto* expressly limited the scope of its analysis, stating explicitly that "[t]he traditional four-factor test applies when a plaintiff seeks a permanent injunction to remedy a NEPA violation." 130 S. Ct. at 2756.

(9th Cir. 2007) (internal quotations omitted).  Injunctive relief is typically appropriate in environmental cases because "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987).  Because of the significant public interest in preserving the environment, a project that violates NFMA generally must be enjoined pending demonstration that the USFS has corrected the NFMA violations.[28] *See, e.g*, *Or. Natural Res. Council Fund v. Goodman*, 505 F.3d 884, 898 (9th Cir. 2007) (enjoining ski resort expansion project for failure to comply with Forest Plan's sensitive species evaluation requirements); *Neighbors of Cuddy Mt.*, 137 F.3d at 1382 (enjoining logging pending compliance with NFMA obligations).

 <u>Irreparable Injury and Inadequacy of Legal Remedies</u>.  Plaintiffs will suffer irreparable injuries if the NSO or other species' habitats are harmed.  *See* Baker Decl. ¶¶ 3-4; Boggs Decl. ¶ 4-8.  Plaintiffs have demonstrated that the NSO and its habitat would be irreparably harmed if the proposed thinning and other management activities are carried out in nesting, roosting, and foraging habitat, especially in the activity centers that are below the FWS' threshold for reproductive success.  *See* DellaSala Decl. ¶ 19 (project will cause serious short-term harm to NSOs).  Because legal remedies for ESA, NEPA, and NFMA violations are inadequate and monetary damages are not available for the loss of an endangered species or Plaintiffs other injuries, equitable relief in the form of a permanent injunction is the appropriate remedy.

 <u>Public Interest</u>.  In actions to protect the environment, "the public's interest in preserving precious, unreplenishable resources must be taken into account in balancing the hardships."

---

[28] "If the Forest Service were permitted to proceed with the project, despite the NFMA and NEPA violations, the issue of the violations would become moot, and it would be both pointless and impossible to remedy the problems once the projects are completed.  For this reason, it is common practice to enjoin a timber project that violates NFMA and NEPA.  *See e.g. Lands Council v. Powell*, 395 F.3d 1019, 1037 (9th Cir. 2005); *Idaho Sporting Congress. Inc. v. Rittenhouse*, 305 F.3d 957, 975 (9th Cir. 2002).  As the Ninth Circuit recently stated, where a logging project 'will prevent the use and enjoyment by [Plaintiffs]' of thousands of acres, there is irreparable injury, and an injunction is warranted.  *Alliance for the Wild Rockies v. Cottrell*, __F.3d _, 2010 WL 2926463, *8 (9th Cir. July 28, 2010)." *Alliance for the Wild Rockies v. Bradford*, CV-09-160-M-DWM, Order Denying Motion To Alter or Amend the Judgment (Dkt #51), Slip. Op. at 8 (D. Mont. Aug. 5, 2010) (attached to Voss Decl. as Exhibit C).

*Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1125 (9th Cir. 2002); *see also Neighbors of Cuddy Mountain*, 137 F.3d at 1382 (noting that the old forests plaintiffs seek to protect "will be enjoyed not principally by plaintiffs and their members but by many generations of the public"). Ultimately, this case is about compliance by the USFS and FWS with the law.  "This invokes a public interest *of the highest order*: the interest in having government officials act in accordance with the law." *Seattle Audubon Soc'y v. Evans*, 771 F. Supp. at 1096 (emphasis added). Moreover, the Ninth Circuit has stated that "[t]he preservation of our environment, as required by NEPA and the NFMA, is clearly in the public interest." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1177 (9th Cir. 2006).

        If the Court finds ESA violation, its analysis is at an end because the ESA has removed the court's traditional equitable discretion in injunction proceedings of balancing the parties' interests, including the economic interests of Defendant-Intervenor. *See Burlington N. R.R., Inc.*, 23 F.3d at 1510–11; *Nat'l Marine Fisheries Serv.*, 422 F.3d at 794.

        <u>Balancing Equities</u>.  If the Court finds violations of either NEPA or NFMA, it must consider the balance of hardships between the Plaintiffs and Defendants and Defendant-Intervenor.  "If environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment." *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 642 (9th Cir. 2004); *Idaho Sporting Congress, Inc. v. Alexander*, 222 F.3d 562, 569 (9th Cir. 2000) (noting that the imminent and continuing logging activities presented "evidence of environmental harm . . . sufficient to tip the balance in favor of injunctive relief").  As discussed above, Plaintiffs will suffer irreparable injury from the loss of forests, species' habitat, or the species themselves if logging is allowed to proceed absent compliance with NEPA or NFMA.  The USFS, however, has no valid interest in violating the law and will not suffer any harm if the Court enjoins implementation of the Beaverslide Project until it has complied with the law. *See Neighbors of Cuddy Mountain*, 137 F.3d at 1382 (because the USFS should have done the analysis in the first instance, it is difficult to ascertain how it can suffer prejudice by having to do so now).  Defendants will suffer little harm except a delay to remedy deficiencies in their NEPA analysis or until Defendants can provide proper monitoring

1    of MIS to ensure that they are providing the viability and diversity of species in the SRNF.

2            Defendant-Intervenor's harm is economic and somewhat speculative.  The Ninth Circuit

3    has stated that "loss of anticipated revenues . . . does not outweigh the potential irreparable

4    damage to the environment."  *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737

5    (9th Cir. 2001).  Moreover, "[w]e have held time and again that the public interest in preserving

6    nature and avoiding irreparable injury outweighs economic concerns."  *Lands Council v.*

7    *McNair*, 494 F.3d 771, 780 (9th Cir. 2007), *vacated on rehearing en banc on other grounds*, 537

8    F.3d 981 (9th Cir. 2008).  Thus, the courts have repeatedly held that economic loss alone cannot

9    outweigh the need to protect our environment from irreparable harm.[29]  Additionally, the Ninth

10   Circuit holds that "[i]n cases where parties seek the suspension of all action until NEPA

11   requirements are met, the courts weigh the scales in favor of those seeking the injunction."

12   *Thomas v. Peterson,* 753 F. 2d 754, 764 (9th Cir. 1985).  Accordingly, economic loss does not

13   outweigh the need to ensure enforcement of federal law.[30]

                                    **CONCLUSION**

15           For these reasons, the Court should hold that the USFS violated the ESA by failing to re-

16   initiate consultation based on information not previously considered that may adversely affect

17   the northern spotted owl.  The Court should also hold that the FWS violated the ESA by failing

18   to use the best available scientific data.  Moreover, the Court should set the FWS' concurrence

19   letters and the Beaverslide Project because they violate the ESA, the Six Rivers National Forest

20   Plan, the NFMA, and NEPA.  A permanent injunction is appropriate for these violations.

---

[29] *See e.g. Idaho Sporting Congress v. Alexander*, 222 F.3d 562, 569 (9th Cir. 2000); *Northern Alaska Environmental Center v. Hodel*, 803 F.2d 466, 471 (9th Cir. 1986); *Sierra Club v. U.S. Forest Service*, 843 F.2d 1190, 1191 (9th Cir. 1988*); National Wildlife Federation v. Marsh,* 721 F.2d 767, 786 (11th Cir. 1983); National Wildlife Fed'n v. National Marine Fisheries Serv., 235 F. Supp. 2d 1143, 1162-63 (W.D. Wash. 2002); *SNFPC v. Tippin,* 2006 WL 2583036 at *21 (E.D. Cal. Sept. 6, 2006); *High Sierra Hikers Ass'n v. Moore*, 561 F. Supp. 2d 1107, 1113 (N.D. Cal. 2008); *Seattle Audubon Soc. v. Evans*, 771 F. Supp. 1081, 1096 (W.D. Wash. 1991); *Colorado Wild, Inc. v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213, 1222 (D. Colo. 2007); *Sierra Club v. Martin*, 71 F. Supp. 2d 1268, 1329 (N.D. Ga. 1996).

[30] See e.g. *Sierra Club v. Bosworth*, 510 F.3d 1016, 1033-1034; *Baykeeper v. U.S. Army Corps of Engineers*, 2006 WL 2711547 *16 (E.D. Cal. Sept. 20, 2006); *Ohio Valley Environmental Coalition v. U.S. Army Corps of Engineers*, 528 F. Supp. 2d 625, 633-634 (S.D.W.Va. 2007).

Case No.: 3:11-cv-04752-SC – Plaintiffs' Notice of Motion and
Motion and Memorandum in Support of Summary Judgment                                    45

Respectfully submitted on this 2nd day of April, 2012,

/s/ *René Voss*

René P. Voss
Sharon Duggan

Attorneys for Plaintiffs

## **CERTIFICATE OF SERVICE**

Pursuant to Civil L.R. 5-6, I hereby certify that today I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, thus effecting service on all parties pursuant to Civil L.R. 5-5.

Dated:  April 2, 2012

/s/ *René Voss*
René Voss